696 A.2d 130

**COMMONWEALTH of Pennsylvania, Appellee,**

v.

**Dell Maurice GEASE, Appellant.**

Supreme Court of Pennsylvania.

Argued Dec. 10, 1996.

Decided May 21, 1997.

Joseph W. Bullen, III, Patrick J. Connors, Media, for D.M. Gease.

William H. Ryan, Jr., Syosset, William R. Toal, III, Media, Robert A. Graci, Office of Attorney General, for Com.

Before FLAHERTY, C.J., and ZAPPALA, CAPPY, CASTILLE, NIGRO and NEWMAN, JJ.

## *OPINION OF THE COURT*

CAPPY, Justice.

This is a direct review of a sentence of death imposed by the Court of Common Pleas of Delaware County and an appeal of the related convictions.[1] Appellant had been incarcerated on convictions unrelated to this current case. He was released on parole in December 1993. His aunt, Ms. Elizabeth Gease, permitted Appellant to live with her. Subsequently, Ms. Gease locked Appellant out of her home because she believed he had stolen from her. Around April 27, 1994, Ms. Gease's body was found in her basement, bound and gagged. On April 28, 1994, Appellant confessed to the police that he killed his aunt. Following a jury trial, Appellant was found guilty of first degree murder,[2] robbery[3] and kidnapping.[4] During the penalty phase, the jury found two aggravating circumstances: (a) that the Appellant committed a killing while in the perpetration of a felony[5] and (b) that the Appellant has a significant history of felony convictions involving the use or threat of violence to the person.[6] Additionally, the jury found one mitigating circumstance, *i.e.*, the capacity of the Appellant to appreciate the criminality of his conduct was substantially impaired.[7] The jury concluded that the two aggravating circumstances outweighed the mitigating circumstance and, accordingly, returned a verdict of death.[8] At a sentencing hearing, the trial judge formally imposed the sentence of death for the first degree murder conviction and a sentence of

1. 42 Pa.C.S.A. § 9711(h)(1); Pa.R.A.P. Nos. 702(b) and 1941(b).
2. 18 Pa.C.S.A. §§ 2501 and 2502(a).
3. 18 Pa.C.S.A. § 3701
4. 18 Pa.C.S.A. § 2901
5. 42 Pa.C.S.A. § 9711(d)(6).
6. 42 Pa.C.S.A. § 9711(d)(9).
7. 42 Pa.C.S.A. § 9711(e)(3).
8. 42 Pa.C.S.A. § 9711(c)(1)(iv).

10–20 years for the kidnapping conviction and an additional 10–20 years for the robbery conviction, which sentences are to be served consecutively.

▇▇▇▇ Although Appellant does not raise the sufficiency of the evidence to sustain the conviction for the crime of first degree murder, we will nevertheless review the record to determine if there was sufficient evidence to sustain the conviction of first degree murder. *Commonwealth v. Zettlemoyer*, 500 Pa. 16, 454 A.2d 937 (1982), *cert. denied*, 461 U.S. 970, 103 S.Ct. 2444, 77 L.Ed.2d 1327 (1983). In reviewing the sufficiency of the evidence, this Court must view all of the evidence and reasonable inferences deducible therefrom in a light most favorable to the Commonwealth as the verdict winner and must determine whether the evidence adduced, when viewed in such a light, would permit a jury to find that all of the elements of the offense were established beyond a reasonable doubt. *Commonwealth v. Rucci*, 543 Pa. 261, 670 A.2d 1129 (1996). In the case of a first degree murder conviction, we must determine whether there was sufficient evidence to prove that Appellant caused the death of another human being by an intentional killing. 18 Pa.C.S.A. §§ 2501(a) and 2502(a). An intentional killing is a "killing by means of poison, or by lying in wait, or by any other kind of willful, deliberate and premeditated killing." 18 Pa.C.S.A. § 2502(d).

▇▇▇▇ In reviewing the record, we find that Ms. Gease's coworkers were concerned by her absence from her employment. Ms. Gease's brother was contacted. On April 27, 1994, Ms. Gease's brother gained entry into Ms. Gease's home and, after discovering its condition, he called the Yeadon police, who found Ms. Gease's bound and gagged body in the basement. On April 27, 1994, Appellant was arrested in Philadelphia in an unrelated matter. While processing Appellant in Philadelphia, the Philadelphia police learned of the murder of Ms. Gease at the address where Appellant had been living. The Philadelphia police contacted the Yeadon police concerning Appellant. The Yeadon police went to Philadelphia and,

after advising Appellant of his rights, they questioned Appellant concerning the murder of his aunt. After some questioning, the Yeadon police requested Appellant's permission to tape the questions and his responses thereto. Appellant agreed. During the course of the taped conversation, Appellant admitted to killing his aunt. At trial, the Commonwealth introduced the cassette tape and a corresponding transcript of that tape wherein the Appellant related the following.

Appellant was previously incarcerated on unrelated charges and had been released on parole. Appellant's aunt permitted him to stay with her following his release. During this stay with his aunt, Appellant had stolen money from her and she had found out about the theft. Fearful that she had informed his parole agent about Appellant's stealing, Appellant confronted his aunt and accused her of informing someone about his stealing. During this confrontation, Appellant choked his aunt and then bound her hands and feet together with a telephone cord. He then dragged her downstairs into a bathroom located in the basement. Appellant then tied her hands and feet together with some rope and placed a portion of the rope around his aunt's neck so that she could not fully extend her body. Appellant then closed the door to the bathroom and turned on the dryer so that no one could hear his aunt's screams. Appellant then went upstairs to collect some items to sell. He returned to the basement to check on his aunt. He found that she had freed her hands from the rope. Appellant then tied her hands better and tied a nightgown around his aunt's mouth and placed blankets over her. Appellant eventually left the house around 6:30 p.m.

Appellant returned to the home the following day around 8 or 9 p.m. Appellant went into the basement, and he heard his aunt screaming. He spoke to his aunt. Appellant then turned on the dryer to drown out her screams. He returned upstairs to collect some more of his aunt's belongings to sell. Appellant left the home and did not return until the following day. Upon his return, he went downstairs. Appellant stated that he could smell urine and feces emanating from his aunt. He saw that she was moving under the blankets. Appellant

then turned the dryer on again and left the residence. He returned the following day to pick up his check from the mailbox but did not enter the residence. Later that same day, Appellant returned to the home and removed his aunt's television, with the help of a confederate, so as to sell it. Appellant then left the home and did not return again. On this last visit, Appellant did not check on his aunt. This concludes our recounting of Appellant's confession.

■ Since the law permits the factfinder to infer that one intends the natural and probable consequences of his acts, we find that Appellant's confession, combined with other testimony and the photographs of the victim admitted into evidence which corroborate the confession, constitute sufficient evidence for the jury to have found each element of murder in the first degree beyond a reasonable doubt. *See, e.g., Commonwealth v. O'Searo,* 466 Pa. 224, 239, 352 A.2d 30, 37 (1976)("First, we know of no proposition more consistent with human experience than the conclusion that absent circumstance to the contrary, a person intends the natural and probable consequences of his act."); *Commonwealth v. Gardner,* 490 Pa. 421, 425, 416 A.2d 1007, 1008 (1980)("If the act of the defendant under all the circumstances properly gives rise to an inference that the appellant knew or should have known that the consequence of his act would be death or serious bodily harm, malice is present.")

■ In his brief to this court, Appellant raises the issue of whether he was denied a fair trial due to alleged prosecutorial misconduct. The facts giving rise to the allegation of prosecutorial misconduct are as follows.

During the guilt phase, the prosecutor had created a visual aid for use in his closing statement. The visual aid was a posterboard which measured approximately 28 inches by 44 inches, upon which the prosecutor had affixed five black and white photographs. The five black and white photographs had all been admitted into evidence during the course of the trial. Each of the black and white photographs affixed to the posterboard measured approximately 8 inches by 10 inches.

The five black and white photographs depicted: 1) Ms. Gease lying face down with her hands bound behind her back and with her head covered with a rag; 2) the right side of Ms. Gease with her hands and feet bound together, lying next to the side of a toilet, her upper torso covered with rags; 3) a man holding a piece of cloth which was used as a gag that was placed in the mouth of Ms. Gease; 4) a close-up shot of the way in which the hands of Ms. Gease were bound; and 5) the face of Ms. Gease, which shows some deformity in the lower left lip area. The deformity in this area was caused by the effects of a virus formed while she was left on the floor bound and gagged.

Anticipating that closing arguments would occur on this particular day, and, therefore, he would need the visual aid, the prosecutor brought this posterboard into the courtroom. The prosecutor placed this posterboard in the courtroom in the same vicinity where he had, on previous days during the trial, placed other Commonwealth exhibits, which included diagrams of streets and a house. When defense counsel saw the back of the posterboard (to which the photographs were affixed) from the vantage point of the defense table, defense counsel stated that he thought the posterboard was one of the Commonwealth's diagrams. Notes of Testimony ("N.T."), 3/15/95 at p. 93. The posterboard with the photographs was visible to the jury given the location where the prosecutor had placed it. The posterboard was viewable by the jury for approximately one hour before the defense counsel became aware of its true nature, whereupon the jury was excused from the courtroom, and a side bar conference was conducted. Defense counsel moved for a mistrial, which was denied. N.T., 3/15/95 at pp. 85–87. The judge did order that the posterboard be removed from the view of the jury.

Appellant complains that the trial court erred in denying his motion for a new trial based upon prosecutorial misconduct. Appellant alleges that he was denied a fair trial due to the prosecutor's actions in placing the posterboard with the photographs within the view of the jury while the defense was putting on the testimony of one of its witnesses. The Appel-

lant argues that such actions amounted to the prosecutor putting on evidence at the same time as the defense was attempting to put on evidence, and that this distracted the jury from the defense witness' testimony. The Appellant characterizes the prosecutor's actions as prosecutorial misconduct. Indeed, the Appellant alleges that the prosecutorial misconduct was so severe that its inescapable effect was to contaminate the entire decision making process and thus merits the reversal, not only of the first degree murder conviction, but also of the convictions of robbery and kidnapping as well.

The Commonwealth counters that the trial court did not abuse its discretion in denying the motion for a new trial. The Commonwealth asserts that the prosecutor did not engage in any misconduct and that the juror's view of photographs which were properly admitted into evidence and which were not inflammatory could not rise to the level of inducing such bias in the jury as to render the jury incapable of rendering a true verdict.

Our standard of review in a case such as this one, involving the trial court's denial of a motion for new trial based on alleged prosecutorial misconduct, is whether the trial court abused its discretion. *Commonwealth v. Faulkner*, 528 Pa. 57, 595 A.2d 28 (1991), *cert. denied*, 503 U.S. 989, 112 S.Ct. 1680, 118 L.Ed.2d 397 (1992). Moreover, a defendant is not entitled to relief for a claim of prosecutorial misconduct unless the unavoidable effect of the prosecutor's actions is to so prejudice the jury that a true verdict cannot be rendered because the existence of bias and hostility generated by the conduct makes it impossible to weigh the evidence in a neutral manner. *Commonwealth v. Hill*, 542 Pa. 291, 666 A.2d 642 (1995), *cert. denied*, —— U.S. ——, 116 S.Ct. 1880, 135 L.Ed.2d 175 (1996). With these standards in mind, we consider Appellant's claim.

First, we note that all five of the photographs were admitted into evidence and viewed by the jury prior to the posterboard incident. Before this court, Appellant does not chal-

lenge the admissibility of the photographs; thus, we must conclude that the photographs in themselves were properly admitted, and, therefore, properly deemed, either not to be inflammatory or, to have essential probative value which outweighed any prejudicial effect. *See Commonwealth v. Rompilla,* 539 Pa. 499, 653 A.2d 626 (1995)(setting forth the standards for the admissibility of photographs).

There is no question that the jurors saw the posterboard. After the jurors were removed from the courtroom, and immediately after conducting the side bar conference with the attorneys regarding this incident, the trial judge called the jury back into the court room and queried them as follows:

THE COURT:

> Now during the course of the morning session, did anybody on the jury have their attention directed towards any of the exhibits located in front of the jury box?

JUROR:

> We all looked at it.

N.T. 3/15/95 at p. 94. Hence, the pertinent question becomes: whether the jurors' viewing of the previously admitted photographs on the posterboard so prejudiced them against the Appellant by generating bias and hostility toward the Appellant that it rendered the jurors incapable of weighing the evidence in a neutral manner and returning a true verdict?

Following upon the colloquy between the judge and the jury concerning whether the jurors had seen the posterboard, the defense counsel requested that the jurors be individually polled as to whether the presence of the pictures distracted them from, or prejudiced them against, the defense psychiatrist's testimony that was being put on at the time the photographs were visible. The trial court complied with the request. The jury indicated that they were not so affected. The trial court concluded this colloquy with the jury by stating that "[l]et the record reflect that the jury is unanimous in that they were not influenced or prejudiced." N.T., 3/15/95 at p. 98. Thus, we reject Appellant's claim that the mere presence

of the posterboard undermined or detracted from the defense witness' testimony.

■ Furthermore, at the time when the prosecution presented its forensic medical expert, Dr. Contostavlos, the prosecution utilized at least two of the black and white photographs during the expert's testimony, namely, the photograph depicting Ms. Gease lying face down with her hands bound behind her back and with her head covered with a rag, and the second photograph depicting the face of Ms. Gease, which shows some deformity in the lower left lip area, and which photograph Appellant characterizes as "probably the most offensive of the photographs". Appellant's Brief to this Court at p. 13. Just after utilizing these two photographs, and a little while before the Commonwealth moved for the admission of the photograph depicting Ms. Gease's face, the trial court gave the following cautionary instruction to the jury:

> Ladies and gentlemen of the jury, the photographs are being offered for informational purposes only to illustrate a matter being submitted to you as evidence. You should consider it for that purpose only and not allow it to distort or inflame your passions or impair you judgment.

> I caution you that you should clear your minds of any emotional feelings that may arise from seeing any unpleasant scenes because of your mission, and your mission, of course, is to decide the facts and issue in this case dispassionately, without any feeling of emotion. **Now these same instructions would apply to any photographs that may at any time during the course of the trial be shown to you.**

N.T. 3/14/95 at p. 126 (emphasis added). In this regard, we note that jurors are presumed to follow instructions. *Commonwealth v. Travaglia*, 541 Pa. 108, 127, 661 A.2d 352, 361 (1995).[9]

■ Given the foregoing, and based upon our review of the record and our independent review of the photographs as

---

9. While we acknowledge that this instruction was given on March 14, 1995, during the Commonwealth's case in chief, the day before the incident wherein the jurors were exposed to the prosecutor's posterboard, we nevertheless find it to be pertinent for our consideration.

mounted on the posterboard, we cannot conclude that the trial court abused its discretion when it determined that the conduct of the prosecutor in placing the posterboard within the view of the jury did not so prejudice the jury against the Appellant by generating bias and hostility toward him that the jury was rendered incapable of weighing the evidence in a neutral manner and of returning a true verdict. Accordingly, this claim does not merit the reversal of any of Appellant's convictions, nor the grant of a new trial.[10]

 Having disposed of our review of the sufficiency of the evidence to support the conviction of first degree murder and of the claim which Appellant raised, we address the duties which are imposed upon us by the Legislature in all cases where a sentence of death has been returned. 42 Pa.C.S.A. § 9711(h)(3) provides that

The Supreme Court shall affirm the sentence of death unless it determines that:

(i) the sentence of death was the product of passion, prejudice or any other arbitrary factor;

(ii) the evidence fails to support the finding of at least one aggravating circumstance specified in subsection (d); or

(iii) the sentence of death is excessive or disproportionate to the penalty imposed in similar cases, considering both the circumstances of the crime and the character and record of the defendant.

Having reviewed the entire record of this case, we cannot conclude that the sentence of death was the product of passion, prejudice or any other arbitrary factor. Instead, we find that the sentence of death was based upon the overwhelming evidence that Appellant intentionally killed his aunt. Thus, 42 Pa.C.S.A. § 9711 (h)(3)(i) does not provide a basis for this Court to vacate the sentence of death.

10. Notwithstanding our conclusion that the prosecutor's conduct did not so prejudice the jury as to merit relief, we admonish against the placing of any display within the view of the jury by any counsel or litigant without the express consent of the court.

■ Furthermore, we find that there was sufficient evidence to support the finding of both aggravating circumstances. The first aggravating factor found was that Appellant has a significant history of felony convictions involving the use or threat of violence to the person. During the penalty phase of the trial, the Commonwealth incorporated all the evidence from the guilt phase into the record of the penalty phase. N.T., 3/20/95 at p. 74. During the guilt phase of the trial, upon rebuttal, the Commonwealth introduced the record of Appellant's conviction for an unrelated robbery which was a felony conviction involving the use or threat of violence to the person. N.T., 3/15/95 at pp. 155–158. In addition to incorporating the evidence of the guilt phase into the penalty phase, the Commonwealth introduced, during the penalty phase, the record of Appellant's previous unrelated conviction for the charge of riot, a felony conviction involving the use or threat of violence to the person. N.T., 3/20/95 at pp. 74–75. Given these convictions for riot and robbery which are a matter of record in the penalty phase, we find that there is sufficient evidence of record supporting the aggravating circumstance of a significant history of felony convictions involving the use or threat of violence to the person.

■ The second aggravating factor which the jury found was that the Appellant committed a killing while in the perpetration of a felony, namely robbery. Appellant was convicted of robbery in the instant case because the jury found that he stole items from his aunt, Ms. Gease after he bound and gagged her and abandoned her in the basement. The record from the guilt phase which was incorporated into the penalty phase supports the fact that Appellant stole from Ms. Gease. Appellant took the stand in his own defense and admitted that while Ms. Gease was bound and gagged in the basement, he sold his aunt's television, stereo, microwave and her jewelry. N.T., 3/14/95 at p. 155. Accordingly, we find sufficient evidence to support the aggravating factor that Appellant killed his aunt during the commission of a felony, namely, robbery.

As there is sufficient evidence to support the finding of both aggravating circumstances, 42 Pa.C.S.A. § 9711(h)(3)(ii) does not provide a basis for this Court to vacate the sentence of death.

Finally, we are required to determine whether the sentence of death was excessive or disproportionate in this case. We have reviewed the sentencing data compiled by the Administrative Office of the Court. Additionally, we have reviewed similar cases, taking into consideration both the circumstances of the offense and the character and record of the Appellant. After this review, we are unable to conclude that the sentence of death was excessive or disproportionate in this case. Accordingly, 42 Pa.C.S.A. § 9711(h)(3)(iii) does not provide a basis for vacating the sentence of death.

We therefore affirm the judgment of the death sentence and the denial of the motion for new trial based upon prosecutorial misconduct.[11]

---

**11.** The Prothonotary of the Supreme Court is directed to transmit to the Governor's office, within 90 days, the full and complete record of the trial, sentencing hearing, imposition of death, and review by this Court. 42 Pa.C.S.A. § 9711(i).