**COMMONWEALTH of Pennsylvania, Appellee,**

v.

**John Barry KELLAM, Appellant.**

Superior Court of Pennsylvania.

Submitted Sept. 14, 1998.

Filed Oct. 23, 1998.

Mark F. Morrison, Uniontown, for appellant.

Peter U. Hook, Asst. Dist. Atty., Uniontown, for the Com., appellee.

Before EAKIN, LALLY–GREEN and TAMILIA, JJ.

TAMILIA, Judge:

Appellant, John Barry Kellem, appeals from the judgment of sentence of from ninety (90) to two hundred and forty (240) months' imprisonment entered on October 29, 1997, following appellant's convictions of murder of the third degree [1] and endangering the welfare of a child.[2] Appellant first claims the jury's verdict was not supported by sufficient evidence and/or is against the weight of the evidence because appellant did not have a legal duty of care towards the deceased infant and because the evidence showed that appellant did not have custody of the child. Second, appellant maintains the Commonwealth failed to prove he possessed the intent required for a conviction of murder of the third degree. Third, appellant argues the verdict was against the law because the definition of caregiver used by the trial court was unconstitutionally vague and because neither the Crimes Code nor any other statute contains an adequate definition of caregiver. Fourth, appellant contends the Commonwealth committed prosecutorial misconduct by (1) questioning witnesses so as to elicit responses regarding appellant's drug use, (2) asking questions regarding appellant's children and their living conditions and (3) implying that appellant had lied when he chose not to testify. Fifth, appellant argues that the prosecution violated his rights under the equal protection clause of the Fourteenth Amendment by striking potential jurors based on race. Finally, appellant claims after-discovered evidence in the form of alibi testimony requires that a new trial be held.

On Sunday, June 30, 1996, at approximately 9:00 p.m., paramedics responded to a 911 call directing them to an emergency at Rear 31, Shady Lane, Uniontown, Fayette County,

---

**1.** 18 Pa.C.S.A. § 2502(c).

**2.** *Id.*, § 4304.

Pennsylvania. Upon arriving at the house, the paramedics found a group of people clustered around the body of a dead infant, who was lying on her back in the middle of the downstairs living room floor. Rigor mortis already had set in, and witnesses described the body as follows, "She was extremely pale. Around her eyes there was a crusty like material. Her lips were all dry. Her face, the skin on her face was all sunken in." (N.T., 10/6/97, at 54.)

At the time, appellant and his children resided in the house with appellant's girlfriend and her children, including the infant. However, social workers found no baby formula and little or no baby food in the house. Upon investigation, police established that the infant was kept in an upstairs bedroom, which was extremely hot and smelled of urine and defecation. On the floor of the room, police found dirty diapers, and in the corner, they discovered a baby crib, which contained stuffed animals and a bottle that was dirty and had milk caked along the bottom.

On July 1, 1996, an autopsy revealed that the infant, Jessica M. Piper, had died from a combination of dehydration, malnutrition and hyperthermia. The pathologist performing the autopsy described a markedly dehydrated and undernourished white female infant clad in an extensively soiled diaper. He found no undiagnosed problems affecting the growth of the child. In his opinion, the child had gone without anything to eat or drink for at least 24 to 48 hours.

Amy Sullivan, the appellant's girlfriend and the victim's mother, testified that she was neither physically, financially nor mentally able to care for her daughter. On several occasions, she had left the infant with friends or relatives. Appellant, however, told Sullivan to retrieve the baby because he wanted to increase her public assistance benefits and because he was afraid people would call Children and Youth Services (N.T., 10/8/97, at 152, 162). On June 13, 1996, Sullivan's mother came to the house to take the children away for a few hours. However,

appellant did not like Sullivan's family and permitted Sullivan's mother to take the baby "only on the condition that she does not take her to Children and Youth Services, the hospital or her sister's home, even if dying." (Trial Court Opinion, Wagner, J., 3/6/98, at 8.)

Sullivan testified that appellant "controlled everything in her life, including raising the children, where to go, and what to wear." *Id.* She gave appellant her Public Assistance checks and food stamps, and appellant would pay for food when they went shopping. Whenever Sullivan was away, appellant would watch the baby, and they both had changed the baby's diapers and fed her.

During the summer of 1996, Sullivan drank heavily and used crack cocaine. On the Friday and Saturday prior to her baby's death, Sullivan stayed out all night drinking, while appellant remained in the house with the children (N.T., 10/9/97, at 24–26). On Sunday morning, Sullivan returned home and asked appellant about the baby. Appellant replied that he had fed the baby, and she was fine (*Id.* at 27). Sullivan then took a nap and did not wake up until 5:00 p.m. (*Id.* at 28).[3] At approximately 9:00 p.m., Sullivan checked on the baby and found that she was dead.

On October 29, 1996, appellant was arrested and charged in connection with the death of Jessica Piper. Thereafter, appellant requested a series of continuances in which he conducted pre-trial discovery. He also requested and was granted reasonable fees for the appointment of a private investigator and an expert medical witness. On October 6, 1997, appellant's case finally went to trial. The jury subsequently found him guilty of third degree murder and endangering the welfare of a child. On October 29, 1997, appellant was sentenced to 90 to 240 months' incarceration for his conviction of murder of the third degree. He received no further sentence for the crime of endangering the welfare of a child. Following the denial of his post-sentence motions, appellant filed notice of this appeal.

---

**3.** Although Sullivan testified that she slept until 5:00 p.m., Charles Henderson testified that he had a cookout in his backyard and observed Sullivan sitting on her doorstep in the morning and during the day (N.T., 10/10/97, at 20).

On appeal, appellant first claims the jury's verdict was not supported by sufficient evidence and/or was against the weight of the evidence because appellant did not have a legal duty of care towards the infant and because the evidence showed that appellant did not have custody of the child. When reviewing a sufficiency of the evidence claim, this Court "must determine whether the evidence was sufficient to establish that the factfinder could have reasonably determined that all of the elements of the offenses were proven beyond a reasonable doubt." *Commonwealth v. Michael*, 544 Pa. 105, 110, 674 A.2d 1044, 1047 (1996). All the evidence must be viewed in the light most favorable to the Commonwealth as the verdict winner. *Commonwealth v. Harris*, 550 Pa. 92, 703 A.2d 441, 445 (1997). "Unlike the challenge of legal sufficiency of the evidence, the complaint that the verdict was against the weight of the evidence requires an assessment of the credibility of the testimony offered by the Commonwealth." *Commonwealth v. Tapper*, 450 Pa.Super. 220, 675 A.2d 740, 742 (1996), *quoting Commonwealth v. Brown*, 538 Pa. 410, 438, 648 A.2d 1177, 1191 (1994). A weight-of-the-evidence claim will only result in the trial court's reversal if the lower court's verdict "is so contrary to the evidence as to shock one's sense of justice." *Commonwealth v. Simmons*, 541 Pa. 211, 229, 662 A.2d 621, 630 (1995).

Initially, we note that criminal liability may be based on either an affirmative act or a failure to perform a duty imposed by law. 18 Pa.C.S.A. § 301, **Requirement of voluntary act**. Furthermore, the failure to act may constitute the breach of a legal duty (1) where expressly provided by statute, (2) *where one stands in a certain status relationship to another*, (3) where one has assumed a contractual duty to care for another, or (4) where one has voluntarily assumed the care of another and so secluded the helpless person as to prevent others from rendering aid. *Commonwealth v. Pestinikas*, 421 Pa.Super. 371, 617 A.2d 1339, 1343 (1992) (en banc). In the case of a parent and child, this Court repeatedly has stated that "[a] parent has the legal duty to protect her child, and the discharge of this duty requires affirmative performance." *Commonwealth v. How-*

*ard*, 265 Pa.Super. 535, 402 A.2d 674, 676 (1979); *see also Commonwealth v. Nixon*, 718 A.2d 311 (Pa.Super.1998); *Commonwealth v. Miller*, 426 Pa.Super. 410, 627 A.2d 741 (1993); *Commonwealth v. Smith*, 389 Pa.Super. 606, 567 A.2d 1070 (1989).

Appellant claims the duty to act is limited to natural and adoptive parents. We disagree. In this age where children reside in increasingly complex family situations, we fail to understand why criminal liability should be strictly limited to biological or adoptive parents. In the instant case, appellant resided with the victim and her mother, exercised a great deal of control over the mother, and voluntarily assumed parental responsibilities with regard to the child. We therefore hold that whenever a person is placed in control and supervision of a child, that person has assumed such a status relationship to the child so as to impose a duty to act.

We find support for this holding from both the civil law and criminal statutes of this Commonwealth. In the civil context, the existence of a special relationship negates the general principle that one has no duty to act so as to protect others. *T.A. v. Allen*, 447 Pa.Super. 302, 669 A.2d 360, 366 (1995) (en banc). Certainly, appellant may be said to have possessed a special relationship to the child in question. Additionally, appellant was convicted of endangering the welfare of a child. *See* 18 Pa.C.S.A. § 4304, **Endangering welfare of children**. Section 4304 expressly provides that "[a] parent, guardian, *or other person supervising the welfare of a child*" may be held criminally liable for endangering the welfare of a child. (Emphasis added.) Finally, the Pennsylvania Supreme Court has interpreted the term "person responsible for the child's welfare" to include such persons as baby-sitters and others who have permanent or temporary custody and control of a child. *Commonwealth v. Gerstner*, 540 Pa. 116, 656 A.2d 108 (1995), interpreting 42 Pa.C.S.A. § 5554, **Tolling of statute (3)**.

At trial, the court defined appellant's duty to act by reference to the Child Protective Services Law, which provides that a

"person responsible for the child's welfare" includes "[a] person who provides permanent or temporary care, supervision, ... or control of a child in lieu of parental care, supervision and control." (N.T., 10/10/97, at 99; 23 Pa.C.S.A. § 6303, **Definitions**, (a) **General rule**.) The above instruction accurately stated the law of this Commonwealth to the jury, and the prosecution presented sufficient evidence to support the jury's implicit finding that appellant provided control and supervision of the child, while the infant's mother was otherwise occupied. In addition, the jury's verdict clearly was not against the weight of the evidence.

Appellant argues he could not be considered to have had custody and control over the child because the child's mother was in the house and taking a nap at the time of the infant's death. However, the fact that the infant's mother was physically present at the moment of death is irrelevant. The pathologist who performed the autopsy stated that the child had not had any food or fluids for between 24 and 48 hours. During the vast majority of this time, appellant was the only adult who could care for the dying infant, and as previously stated, he had a duty to do so. Moreover, appellant did more than merely neglect the baby. When Sullivan arrived home on the morning prior to the child's death, appellant actively deceived her about feeding the baby and about the baby's condition at the time.

■■■ Appellant's second contention is that the Commonwealth failed to prove he possessed the intent required for a conviction of murder of the third degree. "[T]hird-degree murder is a killing done with legal malice but without the specific intent to kill required in first-degree murder." *Commonwealth v. Baskerville*, 452 Pa.Super. 82, 681 A.2d 195, 199–200 (1996). "Malice consists of a wickedness of disposition, hardness of heart, cruelty, recklessness of consequences, and a mind regardless of social duty." *Miller*, 627 A.2d at 744. Malice exists "where the principal acts in gross deviation from the standard of reasonable care, failing to perceive that such actions might create a substantial and unjustifiable risk of death or serious bodily injury." *Commonwealth v.*

*Yanoff*, 456 Pa.Super. 222, 690 A.2d 260, 264 (1997). Malice may also exist where the omission or failure to perform a legal duty was willful and will probably result in the death of the victim. *Pestinikas*, 617 A.2d at 1344.

Apparently, appellant claims the record simply shows that he neglected to care for the infant. We disagree. Appellant obviously knew the infant's mother had not been at the home for an extended period of time. Consequently, he either knew or recklessly disregarded the fact that the child had not consumed any food or fluids for between 24 and 48 hours. Despite his awareness of these facts, appellant never bothered to check on the baby. He left the infant in an extremely hot room for a prolonged period of time, without feeding it or bothering to change its diaper. Clearly, the record supports the jury's finding that appellant acted with malice.

■■■ Appellant next argues the verdict was against the law because the definition of caregiver used by the trial court was unconstitutionally vague and because neither the Crimes Code nor any other statute contains an adequate definition of caregiver. The Pennsylvania Supreme Court, however, has specifically addressed the meaning of a "person responsible for the child's welfare." *Gerstner*, 540 Pa. at 118, 656 A.2d at 109. Moreover, the Court previously evaluated criminal statutes that apply to persons supervising the welfare of a child, and found these statutes were not unconstitutionally vague. *See Commonwealth v. Mack*, 467 Pa. 613, 359 A.2d 770 (1976), evaluating 18 Pa.C.S.A. § 4304, **Endangering welfare of children**. In this case, the trial court gave instructions based on statutory language, which is very similar to that previously approved by the Pennsylvania Supreme Court. Furthermore, such language may be given content by reference to the common sense of the community and the sense of decency which most people possess. *Id.* at 618, 359 A.2d at 772. As a result, appellant's argument is without merit.

■■■ Appellant's fourth argument is that the Commonwealth committed prosecu-

torial misconduct in a number of ways. When a trial court denies an appellant's motion for a new trial on the basis of alleged prosecutorial misconduct, this Court will review the trial court's decision for an abuse of discretion. *Commonwealth v. Gease*, 548 Pa. 165, 173, 696 A.2d 130, 134 (1997). Additionally, "a defendant is not entitled to relief . . . unless the 'unavoidable effect' of the prosecutor's comments or actions 'is to "prejudice" the jury so that a true verdict cannot be rendered because the existence of bias and hostility makes it impossible to weigh the evidence in a neutral manner.' " *Commonwealth v. Hill*, 542 Pa. 291, 301–302, 666 A.2d 642, 647 (1995), *quoting Commonwealth v. Baker*, 531 Pa. 541, 558, 614 A.2d 663, 671 (1992).

Appellant first claims the prosecutor misconduct is that the prosecutor improperly questioned witnesses so as to elicit responses regarding appellant's drug use. Throughout the trial, both the prosecutor and defense counsel made repeated references to Sullivan's use of crack cocaine. On two occasions, Sullivan indicated that appellant bought and/or supplied crack cocaine (N.T., 10/9/97, at 7, 81). Appellant claims these references warrant a new trial. We disagree.

 We find that any references to drug use did not unavoidably prejudice the jury and/or deprive appellant of a fair trial. First, the references to his drug use were brief and overshadowed by discussions about Sullivan's own drug use. Second, defense counsel relied on Sullivan's drug use to undermine her credibility and to show that she was solely at fault for the infant's death. Third, Sullivan and appellant's drug use actually helped explain to some extent why events occurred as they did. Finally, the trial court specifically instructed the jury to disregard any reference to appellant's alleged criminal activity (N.T., 10/9/97, at 8, 81).

 Appellant also argues the prosecutor improperly asked questions regarding appellant's children and their living conditions. After reviewing the record, we find that the trial court adequately addressed this issue when it stated:

In the present case, testimony concerning all the children in the household was elicited by both parties. Various witnesses testified to where the children slept, ate, and played; what the children ate and who fed them; and who watched the children at different times. The Court limited the testimony on other investigatory incidents of Children and Youth Services with respect to the other children in the household. (N.T. 10/7/97 at 197).

However, during the direct examination of commonwealth's witness, Janie Garlick–Orndorff, an intake caseworker at Children and Youth Services, a reference was made to her interview with the defendant because of prior case records. (N.T. at 207). Any confusion created by this remark, however, was cured when the Court correctly instructed the jury that the present case before them deals with only one child. (N.T. at 209).

(Trial Court Opinion, Wagner, J., 3/6/98, at 18.)

Appellant's final claim of prosecutorial misconduct is that the prosecutor acted improperly by implying that appellant had lied about the facts of the case when in fact he chose not to testify. We believe the trial court adequately addressed appellant's assertion.

The Commonwealth's closing arguing inferred that the defendant lied in his statement to Detective Machesky that Jessica was downstairs in a swing the evening of June 30, 1998 while he was playing Nintendo with the children. The evidence revealed that Jessica died earlier in the day and upstairs in her crib. The Court informed the defendant that the Commonwealth could argue inferences that arose out of the evidence which was presented. (N.T. at 10/10/97 at 81). We find that the Commonwealth properly argued the inference that the defendant lied about Jessica being in the swing that evening.

(Trial Court Opinion at 16.)

 Appellant also argues the prosecution violated his rights under the equal protection clause by striking potential jurors based on race. We find this claim to be completely without merit. The prosecutor

only struck a single black juror, and both the prosecutor and a police officer observed that she was sleeping during voir dire (N.T., 10/6/97, at 11). Moreover, the prosecutor struck a white juror for the very same reason.

 Appellant's final argument on appeal is that after-discovered evidence in the form of alibi testimony requires that a new trial be held. Specifically, appellant claims Ed and Linda Reynolds would "testify that on the weekend the child died that [appellant] was with them for most of that entire weekend" and that appellant therefore "could not have been aware of what was going on in [the infant's] life." (N.T., 12/22/97, at 3.) [4] In order to constitute an alibi, a piece of evidence must render it impossible for the defendant to have committed the crime. *Commonwealth v. Kolenda*, 544 Pa. 426, 431, 676 A.2d 1187, 1190 (1996). Furthermore, after-discovered evidence will only form the basis for a new trial if it: 1) has been discovered after the trial and could not have been obtained at or prior to the conclusion of the trial by the exercise of reasonable diligence; 2) is not merely corroborative or cumulative; 3) will not be used solely to impeach the credibility of a witness; and 4) is of such nature and character that a different verdict will likely result if a new trial is granted. *Commonwealth v. McCracken*, 540 Pa. 541, 549, 659 A.2d 541, 545 (1995), *quoting Commonwealth v. Wilson*, 538 Pa. 485, 511, 649 A.2d 435, 448 (1994).

 In this case, we find appellant's claim of after-discovered evidence is simply not credible. First, the Reynolds' proposed testimony is not truly after-discovered evidence in that appellant obviously knew about the Reynolds prior to trial. Appellant claims only that he could not locate them. Second, "[i]t seems incredible that [appellant] would not have known of the location of these two

alleged alibi witnesses." (Trial Court Opinion at 19–20.) Appellant was not prosecuted until approximately one year and four months after the incident, and appellant had obtained the appointment of a private investigator several months prior to trial.[5] Finally, although appellant claims to have spent the weekend with the Reynolds, he previously filed a notice of alibi in which he claimed to have spent the weekend with Tracey Taylor.[6] Record # 29, Motions in Limine and Notice of Alibi, 10/6/97.

*Judgment of sentence affirmed.*

---

4. Although the trial court did not hold an evidentiary hearing on appellant's claim, it did permit appellant to make a complete and concise summary for the record.

5. We note that appellant never had a subpoena issued and never provided notice to the Commonwealth of the Reynolds' proposed alibi testimony (N.T., 12/22/97, at 4, 8).

6. Additionally, Janie Garlick–Orndorff, a caseworker with the Fayette County Children and Youth Services, testified that appellant told her that he had spent most of the day in question at the Hendersons' house (N.T., 10/7/97, at 211).