J-S02035-17

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | |
|---|---|
| COMMONWEALTH OF PENNSYLVANIA | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| Appellee | |
| v. | |
| RAYMOND HOWARD | |
| Appellant | No. 346 EDA 2016 |

Appeal from the Judgment of Sentence December 18, 2015
In the Court of Common Pleas of Philadelphia County
Criminal Division at No(s): CP-51-CR-0010746-2011
CP-51-CR-001745-2011

BEFORE: FORD ELLIOTT, P.J.E., STABILE, J., and MOULTON, J.

MEMORANDUM BY MOULTON, J.: **FILED JUNE 16, 2017**

Raymond Howard appeals from the December 18, 2015 judgment of sentence entered in the Philadelphia County Court of Common Pleas following his jury trial convictions for two counts of criminal attempt to commit murder, two counts of aggravated assault, two counts of persons not to possess or use firearms, and one count each of conspiracy to commit aggravated assault, conspiracy to commit murder, carrying firearms on public streets or public property in Philadelphia, and possession of instrument of crime ("PIC").[1] We affirm.

The trial court set forth the following factual history:

---

[1] 18 Pa.C.S. §§ 901(a), 2702(a), 6105(a)(1), 903, 6108, and 907(a), respectively. The charges stemmed from two criminal docket numbers.

On July 11, 2011, at approximately 11:00 p.m., Leonora Cusick was walking to her house from the Chinese store when she saw Latisha Dudley (herein "Complainant") sitting on the steps of 4533 Hurley Street with two friends, Omar Green and William Ingram. As Ms. Cusick continued past the Complainant to her house . . . , [Howard] and "another character", later identified as Troy Taylor, came out of the house across the street with a shotgun and shot the Complainant in the stomach. The Complainant testified that Mr. Taylor said, "there the bitch go right there," and gave [Howard] the shotgun before shooting the Complainant. When [Howard] pulled the shotgun up towards the Complainant he said, "bitch, you thought it was a joke. Shit going to get real." The Complainant then yelled to Ms. Cusick, "Cookie, Cookie, he shot me. Call 911." [Howard] then ran back inside the house at 4526 Hurley Street. Ms. Cusick saw blood coming out of the Complainant's stomach and then went inside to call 911.[2] Ms. Cusick stated that [Howard] was wearing a "wife-beater and shorts." She later saw [Howard] come back outside, sit next door, and "acted like he was one of the people that was around."

[2] Counsel[] stipulated to the following: The Complainant was admitted to Temple University Hospital on July 12, 2011 with a shotgun wound to her stomach. She was immediately admitted to the ICU and underwent several surgeries, which included the repair of her small stomach, her small bowel, her sacral, and the repair of her colon. Complainant also underwent tracheotomy for ventilator-dependent respiratory failure, as she could no longer breathe on her own. She also had an exploratory surgery of her lung, upper half intestinal surgery, skin graft, and other surgeries. Complainant was not discharged until September 2, 2011.

Officers Jason Hernandez and Officer Carl Diaz both responded to a radio call at around 11:30 p.m. for a shooting that occurred on the 4500 block of Hurley Street. They were first waved over to 4527 Hurley Street where they saw the Complainant on the sofa. At that time, people were pointing across the street to the house at 4526 Hurley Street. After their conversation with the people on the porch of 4526 Hurley Street, they received a

radio call giving them flash information about a black male with a blue hat, white tank top, and dark colored jeans or capris. Officer Hernandez testified that there were only a few people outside, one of which was [Howard]. He saw that [Howard] met the flash information and approached him. The officers asked him if he had seen the shooting and he responded that he did not. The officers then asked what brought him to the block and he stated that he was going to visit a friend at 4526 Hurley Street. The officers received additional information over the radio that indicated that the male the officers were talking to, [Howard], shot the Complainant. At that point [Howard] was apprehended and transported to East Detectives. Officer Diaz testified that he later saw three shotgun shells on the sidewalk and one in the street in front of 4528 Hurley Street.

Officer Jose Carta[]gena received a radio call for a person with a gun on the 4500 block of Hurley Street. Once on scene, he received a separate call for 4500 Tampa Street. When he arrived, he encountered Omar Green lying on the ground suffering from gunshot wounds.[2] He described a pellet wound to the right side of his face, bleeding from his back, and a serious wound to his inner thigh. Mr. Green was then transported to Temple Hospital.

Detective [Glenn] MacClain of Special Investigations arrived to the 4500 block of Hurley Street at about 12:00 midnight on July 12, 2011, with Detective Rash.[3] He drew the crime scene sketch and interviewed Ms. Cusick to identify the shooter in the photo array. She placed her hand over the top of the hair of [Howard] and identified him as the one who shot the Complainant. A search warrant was later conducted on 4526 Hurley Street where no weapon or ballistic evidence was recovered. However, there was an ID/paperwork present that had the name Lionel Tyson on it.

_____

[2] At the time of the shooting, Green had been with Dudley on the steps in front of Dudley's house.

[3] Detective Rash's first name is not in the certified record.

The Commonwealth next called Troy Taylor, also known as "Lionel Tyson", to testify. On October 6, 2015, Mr. Taylor pled guilty to conspiracy to commit murder, and attempted murder. Mr. Taylor lived at 4526 Hurley Street back on July 11, 2011. Earlier in the day on July 11, 2011, Brian Daniels, the Complainant's boyfriend, shot at Mr. Taylor. He testified that [Howard] was not at 4526 Hurley Street that night. He further stated that basically everyone was wearing white tee shirts and tank tops the night of the shooting because it was summertime. Mr. Taylor testified that Eric Tyson - his brother - shot the Complainant, rather than [Howard]. His brother was wearing a white tank top and dark blue capris. He stated that [Howard] was wearing light blue shorts. Although Mr. Taylor said his brother was the shooter, he identified [Howard] at a photo array and pled guilty to facts that incriminate [Howard] as his co-conspirator.

Earlier on July 11, 2011, Officer Stephan and his partner received a radio call for a different shooting that occurred on the 4500 block of Hurley Street. Their vehicle was the first that arrived on location. They were first met by Mr. Taylor who stopped them in the middle of the street and described the shooter as a "black male 5'8 to 5'10, 30 to 35 years old, dark complected, heavy build, wearing a white tee and black pants." The SWAT team later arrived on the scene and did a complete sweep of 4533 Hurley Street. No weapons or persons were found inside the residence. Mr. Taylor provided the full story of the events on July 10th and July 11th of 2011. He stated that he got into a verbal argument with a man over a parking spot on the street, then that man went into 4533 Hurley Street, and came back out with a gun. The man proceeded to chase him around the minivan while shooting at him. The man, later identified as Brian Daniels, got a few rounds off and then ran back into 4533 Hurley Street.

Opinion, 3/23/16, at 3-6 ("1925(a) Op.") (internal citations omitted).

On October 13, 2015, a jury convicted Howard of the above-mentioned crimes. On December 18, 2015, the trial court sentenced Howard to the following consecutive sentences: 10 to 20 years' incarceration for the first

attempted murder conviction; 10 years' probation for the second attempted murder conviction; 10 to 20 years' incarceration for the conviction for conspiracy to commit murder; and 5 to 10 years' incarceration for the conviction for possession of firearm prohibited.[4]   On December 23, 2015, Howard filed a post-sentence motion, which the trial court denied on January 4, 2016.  On January 16, 2016, Howard filed a timely notice of appeal.

Howard raises the following claims on appeal:

> I. Is [Howard] entitled to an Arrest of Judgment on all charges and especially with regard to Criminal Attempted Murder and Conspiracy to Commit Murder and where there is insufficient evidence to sustain the verdict?
>
> II. Is [Howard] entitled to a new trial as the greater weight of the evidence does not support the verdict?
>
> III. Is [Howard] entitled to a new trial as the result of Court error when the Court prohibited cross-examination of forensic analyst Gregory Van Alstine as to his personal experience in successfully recovering DNA evidence from shotgun shells in a specific case?
>
> IV. Is [Howard] entitled to a new trial as the result of Court error where the Court prohibited cross-examination of Commonwealth witness Lionel Tyson as to his bias and prejudice?
>
> V. Is [Howard] entitled to a new trial as the result of Trial Court error where the Court made several errors with regard to the same issue and where the Court failed to give a curative instruction based on mid-trial testimony of

---

[4] The convictions for aggravated assault and conspiracy to commit aggravated assault merged with the attempted murder conviction for sentencing purposes.  The trial court imposed no further penalty for the second firearms not to be carried without a license conviction or the convictions for carrying firearms on public streets in Philadelphia and PIC.

certain detectives that they were aware of the identity of certain 911 callers and where the evidence was never relayed to the defense?

Howard's Br. at 3.

Howard first challenges the sufficiency of the evidence to support his attempted murder and conspiracy convictions.

We apply the following standard when reviewing a sufficiency of the evidence claim:

> [W]hether viewing all the evidence admitted at trial in the light most favorable to the verdict winner, there is sufficient evidence to enable the fact-finder to find every element of the crime beyond a reasonable doubt. In applying [the above] test, we may not weigh the evidence and substitute our judgment for the fact-finder. In addition, we note that the facts and circumstances established by the Commonwealth need not preclude every possibility of innocence. Any doubts regarding a defendant's guilt may be resolved by the fact-finder unless the evidence is so weak and inconclusive that as a matter of law no probability of fact may be drawn from the combined circumstances. The Commonwealth may sustain its burden of proving every element of the crime beyond a reasonable doubt by means of wholly circumstantial evidence. Moreover, in applying the above test, the entire record must be evaluated and all evidence actually received must be considered. Finally, the [finder] of fact while passing upon the credibility of witnesses and the weight of the evidence produced, is free to believe all, part or none of the evidence.

*Commonwealth v. Best*, 120 A.3d 329, 341 (Pa.Super. 2015) (quoting *Commonwealth v. Harden*, 103 A.3d 107, 111 (Pa.Super. 2014)) (some alterations in original).

Howard claims the evidence was insufficient to support the attempted murder conviction because the Commonwealth failed to establish he had a specific intent to kill or that the shooting was premeditated.

"A person may be convicted of attempted murder 'if he takes a substantial step toward the commission of a killing, with the specific intent in mind to commit such an act.'" **Commonwealth v. Jackson**, 955 A.2d 441, 444 (Pa.Super. 2008) (quoting **Commonwealth v. Dale**, 836 A.2d 150, 152 (Pa.Super. 2003)). Further:

> "The *mens rea* required for first-degree murder, specific intent to kill, may be established solely from circumstantial evidence." **Commonwealth v. Schoff**, 911 A.2d 147, 160 (Pa.Super.2006). "[T]he law permits the fact finder to infer that one intends the natural and probable consequences of his acts[.]" **Commonwealth v. Gease**, 548 Pa. 165, 696 A.2d 130, 133 (1997).

**Id.** (alterations in original). "Specific intent to kill can be inferred from the use of a deadly weapon upon a vital part of the victim's body." **Commonwealth v. DeJesus**, 860 A.2d 102, 106 (Pa. 2004).

The evidence established that: Taylor had a prior argument with Dudley and her boyfriend; Taylor gave Howard the gun and said, "there the bitch go right there"; Howard stated, "bitch, you thought it was a joke. Shit going to get real"; Howard fired the gun four times at Dudley and Green; a bullet struck Dudley in the stomach; and pellets struck Green on the right side of his face, his back, and his thigh, causing a serious wound on his inner thigh. This evidence was sufficient to establish that Howard had a specific intent to commit murder. **See DeJesus**, 860 A.2d at 107 ("the fact that

appellant shot the victim in vital body parts independently warranted the jury finding of a specific intent to kill"); ***Jackson***, 955 A.2d at 445 (sufficient evidence of attempted murder where appellant ran from detective, then turned, looked and raised his arm toward detective).[5]

Howard also claims there was insufficient evidence to establish conspiracy because the Commonwealth failed to establish there was an agreement between Howard and Taylor.

Criminal conspiracy is defined as follows:

> A person is guilty of conspiracy with another person or persons to commit a crime if with the intent of promoting or facilitating its commission he:
>
> (1) agrees with such other person or persons that they or one or more of them will engage in conduct which constitutes such crime or an attempt or solicitation to commit such crime; or
>
> (2) agrees to aid such other person or persons in the planning or commission of such crime or of an attempt or solicitation to commit such crime.

18 Pa.C.S. § 903(a). The conspiracy statute further provides:

_____

[5] Howard does not make a separate intent to kill argument with respect to Green. ***Cf***. 18 Pa.C.S. § 303(b)(1) ("When intentionally or knowingly causing a particular result is an element of an offense, the element is not established if the actual result is not within the intent or the contemplation of the actor unless: (1) the actual result differs from that designed or contemplated as the case may be, only in the respect that a different person or different property is injured or affected or that the injury or harm designed or contemplated would have been more serious or more extensive than that caused[.]").

No person may be convicted of conspiracy to commit a crime unless an overt act in pursuance of such conspiracy is alleged and proved to have been done by him or by a person with whom he conspired.

*Id.* § 903(e).[6]  This Court has stated that:

[a]n agreement can be inferred from a variety of circumstances including, but not limited to, the relation between the parties, knowledge of and participation in the crime, and the circumstances and conduct of the parties surrounding the criminal episode. These factors may coalesce to establish a conspiratorial agreement beyond a reasonable doubt where one factor alone might fail.

*Commonwealth v. Irvin*, 134 A.3d 67, 76 (Pa.Super. 2016) (quoting *Commonwealth v. Perez*, 931 A.2d 703, 708 (Pa.Super. 2007)).

Here, the Commonwealth presented sufficient evidence of an agreement to commit murder where Taylor handed Howard a shotgun and stated, "there the bitch go right there," and Howard proceeded to shoot Dudley.

Howard next argues that the verdicts as to attempted murder and conspiracy were against the weight of the evidence.

This court reviews a weight of the evidence claim for an abuse of discretion. *Commonwealth v. Clay*, 64 A.3d 1049, 1054-55 (Pa. 2013). "Because the trial judge has had the opportunity to hear and see the evidence presented, an appellate court will give the gravest consideration to the findings and reasons advanced by the trial judge when reviewing a trial

_____

[6] Howard does not make a separate argument concerning the overt-act requirement.

court's determination that the verdict is against the weight of the evidence." *Id.* at 1055.

A trial court should not grant a motion for a new trial "because of a mere conflict in the testimony or because the judge on the same facts would have arrived at a different conclusion." *Id.* "Rather, 'the role of the trial judge is to determine that notwithstanding all the facts, certain facts are so clearly of greater weight that to ignore them or to give them equal weight with all the facts is to deny justice.'" *Id.* (quoting *Commonwealth v. Widmer*, 744 A.2d 745, 752 (Pa. 2000)). "[A] new trial should be awarded when the jury's verdict is so contrary to the evidence as to shock one's sense of justice and the award of a new trial is imperative so that right may be given another opportunity to prevail." *Id.* (quoting *Commonwealth v. Brown*, 648 A.2d 1177, 1089 (Pa. 1994)).

Here, the trial court found:

> [Howard] had the requisite intent for the charges at issue. Additionally, the Commonwealth established the required elements of all charges through credible witness testimony. Based on the Commonwealth's witnesses, [Howard] and Mr. Taylor co-conspired to shoot the Complainant, which resulted in serious bodily injury to her and Mr. Green. The verdict did not shock one's sense of justice. Therefore, the verdict was not against the weight of evidence and [Howard] is not entitled to a new trial.

1925(a) Op. at 12-13. We conclude the trial court did not abuse its discretion in denying Howard's weight of the evidence claim.

In his third issue, Howard argues that the trial court erred because it did not permit him to cross-examine forensic analyst Gregory Van Alstine.

- 10 -

He claims that, although he stipulated to the admission of Van Alstine's report, the cross-examination would have revealed that the report's conclusions were meritless or lacked foundation.

At trial, Howard stipulated to the admission of Van Alstine's report:

> [Assistant District Attorney]: . . . What's been marked, Your Honor, as C-25, crime scene swab, a DNA report, there has [been] a stipulation by a[nd] between counsel that if Officer Tull were called to testify, he examined those shotgun shells for latent prints. He was unable to find any latent prints on the shotgun shells. He took a DNA swab of all prints submitted by the defendant and he submitted it to the DNA Forensics Lab. The Forensics Lab then ran that DNA and they were unable to obtain DNA from the swabs. The results were either no or inconclusive for the presence of DNA. There is a further stipulation that that is not under the common results.
>
> THE COURT: So-stipulated, Counsel?
>
> [Defense Counsel]: Yes.

N.T., 10/9/15, at 104-05. The Commonwealth then rested and defense counsel moved three exhibits into evidence and stated, "[t]here is no evidence on behalf of the defense today, Your Honor." *Id.* at 109. Howard's appellate brief does not cite to any place in the record where the defense asked to question Van Alstine. Because he stipulated to the report and did not seek to examine Van Alstine at trial, Howard waived this claim.[7]

_____

[7] Further, even if he had not waived this claim, we would find it lacked merit. The trial court concluded: "It is clear that [Howard] stipulated to the C-25 DNA report, therefore, agreeing to all the facts as proven. The proven facts in the report are uncontested and have no need for the cross-examination of the forensic analyst." 1925(a) Op. at 20. We conclude the
*(Footnote Continued Next Page)*

Howard next argues the trial court erred when it prohibited cross-examination of Taylor regarding the sentence Taylor faced pursuant to the sentencing guidelines.

We apply the following standard to trial court decisions regarding limitations to cross-examinations:

> "A trial court has broad discretion to determine whether evidence is admissible," and a trial court's ruling regarding the admission of evidence "will not be disturbed on appeal unless that ruling reflects manifest unreasonableness, or partiality, prejudice, bias, or ill-will, or such lack of support to be clearly erroneous." *Commonwealth v. Huggins*, 68 A.3d 962, 966 (Pa.Super. 2013). In addition, the trial court has broad discretion regarding "both the scope and permissible limits of cross-examination." *Commonwealth v. Briggs*, []12 A.3d 291, 335 ([Pa.] 2011). "The trial judge's exercise of judgment in setting those limits will not be reversed in the absence of a clear abuse of that discretion, or an error of law." *Id.*

*Commonwealth v. Rosser*, 135 A.3d 1077, 1087 (Pa.Super. 2016).[8]

The trial court permitted Howard to cross-examine Taylor regarding his plea agreement with the Commonwealth and his sentence, but precluded Howard from questioning Taylor regarding the applicable sentencing guidelines.

*(Footnote Continued)* ───────────────

trial court did not abuse its discretion. *See Commonwealth v. Hoover*, 107 A.3d 723, 729 (Pa. 2014) (determinations as to admissibility of evidence reviewed for abuse of discretion).

[8] Howard argues that the trial court abused its discretion by limiting the cross-examination. He does not argue that such limitation violated his Sixth Amendment right to confront witnesses.

Prior to Taylor's testimony, the following exchange occurred:

THE COURT: And what we do need to address is the maximum sentence and fines. I don't think that is necessary for the jury to know that.

[ADA]: That's fine.

THE COURT: Considering we're looking at some of those same charges here.

[ADA]: The sentence that he received, Your Honor, I think that is admissible, Your Honor. Not the maximum, but the sentence that he received. I think it's directly relevant to – obviously, the that he's in, the time that he took. It's not like he got out on bail because he pled guilty or that he walked home. I think it definitely shows how solemn this is as a process. It is not something somebody would take lightly.

[DEFENSE COUNSEL]: I'm alright with it, Your Honor.

THE COURT: If he's all right with it, that's fine.

[DEFENSE COUNSEL]: As long as we can talk about the guideline being 210 months.

THE COURT: See that's the problem. I do not want all that because I don't want that in the jury's mind when they're deliberating about what the penalty might be. And I think that is the problem.

[DEFENSE COUNSEL]: Well I think the issue is he received a very light sentence.

THE COURT: I think that what we can say is that he received a period of incarceration.

[ADA]: And I'm going to ask him if he's currently incarcerated.

THE COURT: That's fine, did he receive a period [of] incarceration as a result of this plea. But we're not going to get into the specifics.

[DEFENSE COUNSEL]: And the fact that his sentence is 11 years below the guidelines?

- 13 -

THE COURT: We are not even opening that door. He just received a period of incarceration. We are not even going there.

[DEFENSE COUNSEL]: That is awesome impeachment that he got a great deal in this case, without even having to cooperate. I should at least be able to say that he got a significant reduction in the sentence.

[ADA]: Well we can't back-door in one thing if we are not letting in the other. If I can't get in the exact time of his sentence, then we can't be like he got a significant reduction in what he was going to receive. I mean, you're right, the jury is going to have to know – if they will be thinking about what the penalties are going to be in this case, and if [defense counsel] is going to be implying that it is extremely high, or whatever, isn't that the same exact thing that you want to heed against, actually bringing the guidelines in? Your Honor, so if he received a period of incarceration and he is currently incarcerated, I agree with you and think that is admissible.

. . .

[DEFENSE COUNSEL]: He is asking for the polluted source instruction, the accomplice testimony that says you should take his testimony – he is asking that for his witness. I know when I try to impeach him about the terms of his sentence which is negotiated by the Commonwealth at a severe discount to the guidelines, that is perfectly relevant. If he's going to say it's a polluted source, I need to be able to say, yeah, you took a deal because it was really, really good.

[ADA]: Judge, I should just say this as a brief point of clarification. I only included the polluted source charge because I felt it was applicable. . . . But if he doesn't think that, and he is going to obviously waive that for appeal, thinks that that's not an issue in this case, then I am certainly not going to ask you for a polluted source charge.

. . .

THE COURT: . . . What I will allow is that we are not going to talk about specific numbers. You can talk about – you can bring in some of the information you wanted to elicit

- 14 -

about – your viewpoint on that, but [the ADA] can counter, but you just cannot counter with guidelines and numbers and things of that nature.

N.T., 10/9/15, at 7-12.

Further, during defense counsel's cross-examination of Taylor, the following exchange occurred:

Q: You were facing a lot of jail time in this case, weren't you?

A: Correct.

Q: And you are going to be getting out in just a couple of years, correct?

A: Correct.

Q: Because you got a good deal?

A: Correct.

Q: And you got a good deal without even any kind of agreement to help the DA, correct?

A: Correct.

Q: So when we talk about deals, right, part of a deal is cutting your losses when you're ahead, right?

A: Yes.

Q: So you saw an opportunity to avoid trial and make sure you were getting out in just a couple of years, correct?

A: Correct.

Q: If he had said you shot that girl with Elvis Presley, you would have said, yeah, for that deal I would have taken that.

A: Correct.

N.T., 10/9/15, at 32-33.

Accordingly, Howard was permitted to elicit testimony that Taylor had bias and motive to implicate Howard at his plea hearing because he received a reduction in his sentence. We conclude the trial court did not abuse its discretion in precluding the use of Taylor's specific sentence and the applicable sentencing guideline numbers.

Finally, Howard contends the trial court erred in refusing to issue missing witness and missing evidence instructions to the jury. He claims that Detective MacClain testified that the prosecution knew the names and addresses of the 911 callers through a reverse-look-up system, but did not provide them to the defense. He further maintains that the prosecution withheld information that three witnesses the police spoke with on the day of the shooting no longer resided in Pennsylvania.

Howard provides no citation to the record, no witness names, and cites no case law in support of his argument. Accordingly, he has waived this claim. *See* Pa.R.A.P. 2119(a) (each portion of the argument section of brief shall include "such discussion and citation of authorities as are deemed pertinent"); *Commonwealth v. Johnson*, 985 A.2d 915, 924 (Pa. 2009) ("[W]here an appellate brief fails to provide any discussion of a claim with citation to relevant authority or fails to develop the issue in any other meaningful fashion capable of review, that claim is waived.").

Further, even if Howard had not waived the claim, we would conclude that it lacks merit. It appears Howard requested a missing witness instruction because the Commonwealth did not call Omar Green, Maria

Rodriguez, or Xavier Cotto and a missing evidence or witness instruction because he first learned that that the police department performed a reverse look-up on the telephone numbers that called 911 on the night of the incident during Detective MacClain's testimony.[9]  N.T., 10/9/15, at 88-100.

"[O]ur standard of review when considering the denial of jury instructions is one of deference—an appellate court will reverse a court's decision only when it abused its discretion or committed an error of law." **_Commonwealth v. Galvin_**, 985 A.2d 783, 798-99 (Pa. 2009).

A missing witness adverse inference instruction states:

> When a potential witness is available to only one of the parties to a trial, and it appears this witness has special information material to the issue, and this person's testimony would not merely be cumulative, then if such party does not produce the testimony of this witness, the jury may draw an inference that it would have been unfavorable.

_____

[9] Detective MacClain testified that another detective called the phone numbers who had called 911.  He stated that the detective

> called the other numbers back, but we did not get anybody.  Some we left messages, which is common.  Sometimes we leave a message . . . and they don't call back, or they call back.  I believe [Cusick] was the only one that was contacted and maybe one other person that said they heard shots.

N.T., 10/8/15, at 190-91.  Further, Detective MacClain testified that there was a bench warrant out for Green's arrest, **_id._** at 176, and, on cross-examination stated that Green was in "Georgia, North Carolina, or something like that" and "[t]here are other witnesses" in Georgia too, **_id._** at 196.

- 17 -

***Commonwealth v. Evans***, 664 A.2d 570, 573 (Pa.Super. 1995) (quoting

***Commonwealth v. Manigault****,* 462 A.2d 239, 241 (Pa. 1983)). Similarly,

a missing evidence instruction is appropriate "where evidence which would

properly be part of a case is within the control of the party in whose interest

it would naturally be to produce it, and, without satisfactory explanation he

fails to do so, the jury may draw an inference that it would be unfavorable to

him." ***Clark v. Phila. Coll. of Osteopathic Med.***, 693 A.2d 202, 204

(Pa.Super. 1997) (quoting ***Haas v. Kasnot****,* 92 A.2d 171, 173 (1952)).

This Court has stated:

> [F]or the "missing witness" adverse inference rule to be invoked against the Commonwealth, the witness must be available only to the Commonwealth and no other exceptions must apply. In order to determine whether a witness was "available" to a party, the trial court must ascertain whether the witness was "peculiarly within the knowledge and reach" of one party.

***Evans***, 664 A.2d at 574 (citations omitted).

As to the information regarding the 911 callers, the trial court noted

that "[t]he Commonwealth point[ed] to Pa.R.Crim.P. Rule

573[(B)(2)](a)(i),[10] arguing that the names and addresses of witnesses are

_____

[10] Pennsylvania Rule of Criminal Procedure 573(B)(2)(a)(i) provides:

> (a) In all court cases, except as otherwise provided in Rules 230 (Disclosure of Testimony Before Investigating Grand Jury) and 556.10 (Secrecy; Disclosure), if the defendant files a motion for pretrial discovery, the court may order the Commonwealth to allow the defendant's attorney to inspect and copy or photograph any of the

*(Footnote Continued Next Page)*

discretionary discovery" and argued that Howard never requested the information. 1925(a) Op. at 23. Further, as to the missing witnesses, the trial court noted that the Commonwealth searched for Green, Rodriguez, and Cotto, "in good faith . . . only to find that they were in Atlanta." *Id.*

The trial court concluded that no missing witness or evidence instructions were needed, reasoning that "missing witness and missing evidence instructions only apply when certain evidence is in exclusive control of the Commonwealth and when they fail to produce them or they withhold them from counsel." *Id.* Further, it found that a missing evidence instruction would insinuate that the Commonwealth is purposely withholding evidence, which was not proper here because the Commonwealth acted in good faith in attempting to locate the witnesses. *Id.*

We agree and conclude that the trial court did not err in refusing to issue missing witness and missing evidence jury instructions.

Judgment of sentence affirmed.

_____

*(Footnote Continued)*  _____

> following requested items, upon a showing that they are material to the preparation of the defense, and that the request is reasonable:
>
> (i) the names and addresses of eyewitnesses; . . .

Pa.R.Crim.P. 573(B)(2)(a)(i).

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 6/16/2017