757 A.2d 859

COMMONWEALTH of Pennsylvania, Appellee

v.

Shawnfatee Michael BRIDGES, Appellant.

Supreme Court of Pennsylvania.

Argued Nov. 15, 1999.

Decided Aug. 24, 2000.

2

4

Peter David Maynard, Reading, for appellant, Shawnfatee Michael Bridges.

Mark C. Baldwin, for appellee, Com.

Iva Dougherty, Reading, Robert A. Graci, Harrisburg, for appellee, Office of Atty. Gen.

Before FLAHERTY, C.J., and ZAPPALA, CAPPY, CASTILLE, NIGRO, NEWMAN and SAYLOR, JJ.

## *OPINION*

NEWMAN, Justice.

Shawnfatee Michael Bridges (Appellant) files this appeal from the Judgment of Sentence of the Court of Common Pleas of Berks County that sentenced him to death following two convictions for first-degree murder. After reviewing the record sent to this Court, and the claims raised by Appellant, we affirm the sentences of death.

 This Court directly reviews all cases in which the death penalty has been imposed. *See:* 42 Pa.C.S. § 9711(h). Part of that review is an independent review of the sufficiency

of the evidence, regardless of whether an appellant challenges the conviction on that ground or any other grounds. *Commonwealth v. Zettlemoyer*, 500 Pa. 16, 454 A.2d 937 (1982), *cert. denied*, 461 U.S. 970, 103 S.Ct. 2444, 77 L.Ed.2d 1327, *reh'g. denied*, 463 U.S. 1236, 104 S.Ct. 31, 77 L.Ed.2d 1452 (1983). When reviewing the sufficiency of the evidence, we must determine whether the evidence, and all reasonable inferences deducible from that, viewed in the light most favorable to the Commonwealth as verdict winner, are sufficient to establish all of the elements of the offense beyond a reasonable doubt. *Commonwealth v. Hall*, 549 Pa. 269, 701 A.2d 190, 195 (1997), *cert. denied*, 523 U.S. 1082, 118 S.Ct. 1534, 140 L.Ed.2d 684 (1998). To sustain a conviction for first-degree murder,[1] the Commonwealth must prove that the defendant acted with a specific intent to kill, that a human being was unlawfully killed, that the accused did the killing,[2] and that the killing was done with deliberation. *Id.* at 196. It is the specific intent to kill that distinguishes murder in the first degree from lesser grades of murder. *Commonwealth v. Smith*, 548 Pa. 65, 694 A.2d 1086, 1088 (1997), *cert. denied*, 525 U.S. 847, 119 S.Ct. 118, 142 L.Ed.2d 95 (1998). We have held that the use of a deadly weapon on a vital part of a human

1. Section 2502 of the Crimes Code, 18 Pa.C.S. § 2502, provides, in pertinent part:

 § 2502 Murder.
 (a) Murder of the first degree.—A criminal homicide constitutes murder of the first degree when it is committed by an intentional killing.
 . . .
 (d) Definitions.—As used in this section the following words and phrases shall have the meanings given to them in this subsection;
 . . .
 "Intentional killing." Killing by means of poison, or by lying in wait, or by any other kind of willful, deliberate and premeditated killing.

2. A person can be held legally responsible for the conduct of another. Section 306 of the Crimes Code provides that one is legally accountable for the conduct of an accomplice and defines accomplice as one who "(1) with the intent of promoting or facilitating the commission of the offense, he (i) solicits such other person to commit it; or (ii) aids or agrees or attempts to aid such other person in planning or committing it; or (2) his conduct is expressly declared by law to establish his complicity." 18 Pa.C.S. § 306(c).

body is sufficient to establish the specific intent to kill. *Commonwealth v. Walker*, 540 Pa. 80, 656 A.2d 90, 95(Pa.), *cert. denied*, 516 U.S. 854, 116 S.Ct. 156, 133 L.Ed.2d 100 (1995). Finally, the Commonwealth can prove the specific intent to kill through circumstantial evidence. *Commonwealth v. Brown*, 551 Pa. 465, 711 A.2d 444, 449 (1998).

## I. *FACTS AND PROCEDURAL HISTORY*

The facts of the instant matter, as ably summarized by the trial court, are as follows:

On Saturday, December 7, 1996, the girlfriend of the [Appellant], Shawnfatee M. Bridges was robbed at gunpoint while she was staying at the [Appellant]'s home. The [Appellant] was working at the Casablanca Club and not home at the time. The [Appellant] returned home and the girlfriend related to the [Appellant] that during the robbery "a whole bunch of guys ran in with masks and hoodies." (N.T. 1/28/98 p. 103 1). The [Appellant] then returned to the Casablanca Club and told Co–Defendant Richard Morales what had happened.

At approximately 12 noon on Sunday, December 8, 1996, the [Appellant], Shawnfatee Bridges, and Co–Defendant Richard Morales drove the [Appellant]'s blue minivan to the home of a mutual friend, George Robles. Also present at the Robles' home that day was the third Co–Defendant, Roderick Johnson. When Bridges and Morales first arrived, they spoke with Co–Defendant Johnson, but soon thereafter, they called Robles downstairs. Robles testified at trial that Bridges explained, " . . . how the Banks' boys went in his house with guns to his girlfriend's head and his kid was there and how he was going to take care of them right now." (N.T. 1/29/98 p. 1057). During the same conversation, the [Appellant] said, "I gotta take them out. I am gonna get them and I'm gonna kill them and I'm going to put an end to this forever. Because if I let them get away with it now they are going to try to do it again so I'm going to have to do what I have to do." (N.T. 1/29/98 p. 1058). Then all three co-defendants tried, unsuccessfully, to

convince Mr. Robles to join them. Despite Mr. Robles' refusal, the conversation continued with all three co-defendants saying, "we are gonna kill them. We are going to put an end to this." (N.T. 1/29/98 p. 1058). At approximately this point in the conversation, the [Appellant] pulled out a 9 mm. Glock handgun and continued to say how he was "gonna kill them." ' (N.T. 1/29/98 p. 1059). As the planning progressed, the three talked about when the killings would take place. According to Robles, Roderick Johnson wanted to implement their plan immediately, but [Appellant] Bridges wanted to "wait until it gets dark because then we don't have to worry about as many people." (N.T. 1/29/98 p. 1061).

Later that afternoon, at approximately 5:30, Bridges, Morales and Johnson arrived at the Banks' house. The [Appellant], Shawnfatee Bridges, went in the house and talked with the victims, Damon and Gregory Banks. Before leaving, Damon Banks went upstairs and, unbeknownst to Bridges, loaded a .32 caliber automatic handgun which he took with him. (N.T. 1/28/98 p. 10). The three co-defendants and the two victims left the home of Damon and Greg Banks at approximately 6:00 PM. All five of them left in the blue Plymouth Voyager owned by the [Appellant]. (N.T. 1/29/98 p. 1012).

According to the [Appellant]'s statement, the five occupants of the van, "drove down Neversink, pulled in to a little cut in a road." Roderick Johnson was in the driver's seat. The [Appellant], Shawnfatee Bridges was in the front passenger seat. Richard Morales was seated next to the sliding door. Damon Banks was seated behind Roderick Johnson and Greg Banks was seated between Morales and Damon Banks. According to Shawnfatee Bridges' own statement, after they had pulled over to the side of the road, Roderick Johnson began shooting both victims. (N.T. 1/28/98 pp. 1029–30). Then Johnson ran around the side of the van opened the door and pulled the victims out of the van and continued to shoot. At that point, again according to Bridges' own statement, the [Appellant] saw a gun on the

floor and began to shoot in the direction of Johnson. When Johnson began to run away from the van, Bridges returned to the van and left. Bridges drove to a street corner in Reading and poured gasoline in the van and set a match to it, completely gutting the van. At that point the [Appellant] returned home. Subsequently, Johnson was located approximately four miles' away from the scene of the shooting, at the Queen City Restaurant. He was transported to the Reading Hospital, where the bullet was surgically removed. Eventually, the [Appellant] went to the home of Richard Morales and stayed there overnight. The next day, as news about the Banks shooting, the shooting of Roderick Johnson, and the burning of the [Appellant]'s van began to spread, the [Appellant] called a friend of his to take him to the airport in Philadelphia, ostensibly to visit relatives. Meanwhile, members of the Exeter Police Department, the Reading Police Department, and the Pennsylvania State Police began the process of piecing together what had happened. At approximately 7:20 PM, on the night of the murders, officers from Exeter arrived at the scene. They secured the area and began the process of collecting evidence. Among the evidence collected were eight (8) 9 mm. shell casings. (N.T. 1/27/98 p. 817). In addition, in a separate location, officers located a 9 mm. bullet and another shell casing. (N.T. 1/27/98 p. 820).

In addition, Officer Rowe, of the Reading Police Department, was dispatched to the scene of the van fire. That night officers collected one spent shell casing and one shotgun. Subsequently, investigators sifted through the charred remains of the van and discovered an additional bullet. Both of the bullets were analyzed and found to be .9 mm. projectiles.

The bodies of Damon and Gregory Banks were transported to Reading Hospital so that an autopsy could be performed. Dr. Nell Hoffman, Forensic Pathologist, testified that the body of Gregory Banks was riddle[d] with five (5) gunshot wounds. The most fatal of which were the two (2) head wounds. Additionally, he testified that, the body of Damon

Banks sustained thirteen (13) bullet wounds. One of the thirteen projectiles was bullet "D" which entered the victim at the back, right side of the neck where it severed the spinal cord. According to Dr. Hoffman, this instantaneously rendered Damon Banks a quadriplegic. (N.T. 1/29/98 p. 1215). Dr. Hoffman testified that the manner of death for both Damon and Gregory Banks was homicide. (N.T. 1/29/98 pp. 1216 and 1227).

Finally, Trooper Kurt Tempinski of the Pennsylvania State Police Laboratory, Ballistics Section, examined two bullets recovered from the van, two bullets recovered from the body of Gregory Banks, and eight bullets recovered from the body of Damon Banks and found that all the marks exhibited by the bullets were consistent with each other and therefore had to have been fired from the same gun. In addition, Trooper Tempinski stated that, in his expert opinion, a Glock is the only weapon that demonstrates the particular markings found on both the bullets and shell casings recovered in this case. (N.T. 1/29/98 p. 1118).

Trial Court Opinion, pp. 4–7. After returning from New York City, Appellant surrendered himself to county detectives on December 16, 1996. He was charged with murder and other offenses on December 23, 1996. His trial began on January 21, 1998. On February 3, 1998 the jury found Appellant guilty of two counts of murder of the first degree,[3] four counts of aggravated assault,[4] two counts of conspiracy to commit murder,[5] four counts of conspiracy to commit aggravated assault,[6] and one count each of possessing an instrument of crime,[7] tampering with or fabricating physical evidence [8] and hindering apprehension or prosecution.[9] After a penalty hearing, the jury set the penalty at death for both counts of first

[3]. 18 Pa.C.S. § 2502(a).

[4]. 18 Pa.C.S. § 2702(a)(1), (4).

[5]. 18 Pa.C.S. § 903(a)(1), (2).

[6]. 18 Pa.C.S. § 903(a)(1), (2).

[7]. 18 Pa.C.S. § 907(a).

[8]. 18 Pa.C.S. § 4910(1).

[9]. 18 Pa.C.S. § 5105(a)(3).

degree murder. The trial court formally imposed the sentence of death on February 23, 1998.

As stated previously, we are required to review the record for sufficiency of evidence. After our independent review of the 1700 page record of Appellant's trial, we find that the evidence presented to the jury, viewed in the light most favorable to the Commonwealth, establishes that the Commonwealth presented more than sufficient evidence to support both of Appellant's convictions for first degree murder. We turn now to the specific allegations of error raised by Appellant.

## II. DISCUSSION.

### A. PRE-TRIAL ISSUES AND JURY SELECTION

#### 1. Omnibus Pretrial Motion

In his first claim of error, Appellant challenges several rulings of the trial court, which were made in response to his omnibus pretrial motion. Pursuant to Pa.R.Crim.P. Rule 306, Appellant filed a twenty-five count omnibus pretrial motion dealing with issues such as suppression, change of venue, expert witnesses, sequestration and pretrial discovery. After holding hearings on the motions, the trial court granted some of Appellant's motions, denied some motions, and deferred ruling on other motions. On appeal, Appellant challenges the denial by the trial court of his request for court funds to pay for a statistician and a ballistics expert to help him prepare his defense.

We first note that the decision of whether or not to appoint an expert witness is within the sound discretion of the trial court and will not be disturbed absent an abuse of that discretion. *Commonwealth v. Carter*, 537 Pa. 233, 643 A.2d 61, 72 (1994), *cert. denied*, 514 U.S. 1005, 115 S.Ct. 1317, 131 L.Ed.2d 198 (1995). While an accused in a capital case is entitled to the assistance of experts necessary to prepare his defense, there is no obligation on the part of the Commonwealth to pay for the services of an expert. *Id.* at 73.

18

Additionally, a defendant "is not entitled to unlimited court appointed experts until he finds one that renders the opinion he desires." *Commonwealth v. Faulkner,* 528 Pa. 57, 595 A.2d 28, 37 (1991), *cert. denied,* 503 U.S. 989, 112 S.Ct. 1680, 118 L.Ed.2d 397 (1992). Finally, we note that the trial court did grant Appellant's request for the appointment of both a psychologist and a private investigator.

■ We turn now to Appellant's claim that the trial court erred in denying his request for a statistician. Appellant requested the expert to assist him in determining the "representativeness of various classes in past and present jury arrays." Omnibus Pretrial Motion, para. 28. We find no error on the part of the trial court in denying this motion. The trial court stated when it denied Appellant's request, "This Court is aware that in this County we use voter registration lists and the motor vehicle license lists" from which the jury is summoned. N.T. 9/19/97 p. 5. As this Court has stated, "a criminal defendant may not attack the racial composition of jury panels drawn from voter registration lists on the theory that blacks are underrepresented in voter lists" because such computer generated lists are compiled without regard to race. *Commonwealth v. Henry,* 524 Pa. 135, 569 A.2d 929, 933 (1990), *cert. denied,* 499 U.S. 931, 111 S.Ct. 1338, 113 L.Ed.2d 269 (1991). This Court has repeatedly rejected the argument that a jury pool chosen from voter registration does not represent a fair cross section of the community. *Commonwealth v. Abu–Jamal,* 553 Pa. 485, 720 A.2d 79, 114 (1998), *cert. denied,* 528 U.S. 810, 120 S.Ct. 41, 145 L.Ed.2d 38 (1999). For that reason, the trial court did not err in denying this request.

■ We also find that the trial court did not err in denying Appellant's request for a ballistics expert. Appellant claims that, because testimony at trial indicated that four separate weapons were involved in the murders, the appointment of a ballistics expert would have helped the jury better understand his statement to the police and "refute the prosecutor's argument concerning inferences to be drawn from the evidence."

Appellant's Brief at 4. Beyond this bald statement, Appellant has not articulated how a ballistics expert would have helped him at trial, how the lack of a ballistics expert prejudiced him, or how the trial court abused its discretion in denying his request. Consequently, this claim fails.

Also included in Appellant's omnibus pretrial motion was a Motion to Quash Information, which the trial court denied and which Appellant now claims as error. In this appeal, Appellant asserts that the criminal complaint as originally filed did not charge him with conspiracy to commit aggravated assault, but that he was charged with this crime later in the information filed against him. We note however, that the transcript attached as Exhibit B in support of his motion to quash does list in its "Description of Charges" four counts of conspiracy to commit aggravated assault. This claim, therefore, fails.

## 2. *Denial of Motion to Suppress*

In another pretrial claim, Appellant challenges the denial by the trial court of his motion to suppress the statement he gave to police on December 16, 1996. Appellant argues that because his police interrogation began between 12:30 and 1:00 p.m. on December 16, 1996, and his written statement was not given until 8:15 p.m., that statement was obtained in violation of the six-hour *Davenport/Duncan* rule and should have been suppressed.

Our standard of review in evaluating a trial court's denial of a motion to suppress is as follows:

In reviewing a trial court's suppression ruling, our initial task is to determine whether the factual findings are supported by the record. In making this determination, we must consider only the evidence of the prosecution's witnesses, and so much evidence of the defense that remains uncontradicted when fairly read in the context of the record as a whole. When the evidence supports the factual findings, we are bound by such findings; we may reverse only if the legal conclusions drawn therefrom are erroneous.

*Commonwealth v. Williams,* 539 Pa. 61, 650 A.2d 420, 425–26 (1994).

In *Commonwealth v. Davenport,* 471 Pa. 278, 370 A.2d 301 (1977), this Court held that if the police do not arraign an accused within six hours of his or her arrest, any statement obtained after arrest and before arraignment may not be admitted at his trial. In *Commonwealth v. Duncan,* 514 Pa. 395, 525 A.2d 1177 (1987), we modified this rule and provided that if the statement is obtained within six hours of arrest, absent coercion or other illegality, such statement is admissible. *See Commonwealth v. Hughes,* 521 Pa. 423, 555 A.2d 1264, 1278 (1989). The purpose of the six-hour rule "is to insure that an arrestee is not held indefinitely in a coercive custodial atmosphere without the benefit of an arraignment which provides the arrestee with a full explanation of his constitutional rights and the nature of the charges against him." *Commonwealth v. Bond,* 539 Pa. 299, 652 A.2d 308, 312 (1995). Within the facts of this case, *Davenport/Duncan* is inapplicable.

As part of the murder investigation, the police interviewed Appellant's accomplice, Richard Morales, and obtained a statement from him implicating Appellant in the murders of Gregory and Damon Banks. The Berks County District Attorney's office wanted to question Appellant about the murders, but he had fled to New York City. On December 13, 1996, the Berks County District Attorney's Office obtained an arrest warrant for Appellant for a parole violation.

On December 16, 1996 at 6:00 a.m., Appellant called Jimmie Butler (Butler), a Special Agent of the Attorney General's office, who was a friend of Appellant's father and was not involved in the investigation of the murders of the Banks cousins. Butler informed Appellant that he was probably in violation of his parole, that his family was worried about him, and that the police wanted to question him regarding the murders. Butler persuaded Appellant to return to Reading and agreed to meet him at the bus terminal. Appellant arrived in Reading the same day between 11:00 a.m. and noon, and was met by Butler, Lieutenant Lionel Carter of the

Reading Police Department, Reverend Frank McCracken, and the parents of Appellant. Butler told Appellant that he was not under arrest, but that everyone present at the bus terminal wanted him to go to the courthouse to "try and clear matters" regarding the murders. N.T. 10/1/97 p. 76. Butler testified that he was not aware that there was an outstanding warrant for Appellant's arrest for the parole violation and that he believed Appellant was surrendering himself to the authorities in connection with the murders. The group arrived at the courthouse between noon and 12:30 p.m., and proceeded to the District Attorney's office on the fifth floor.

At approximately 1:15 p.m., Detective Albert Schade of the Reading Police Department met with Appellant in an interview room of the District Attorney's office, along with Investigator Michael Bailey of the Exeter Township Police and Reverend McCracken. Detective Schade advised Appellant that he was then in custody for a parole violation, but that there was no warrant for him for a homicide at that time. At about 1:25 p.m., Detective Schade informed Appellant that he wanted to question him about the murders of the Banks cousins and read Appellant his *Miranda* warnings and waiver. Appellant was not handcuffed and Reverend McCracken was present in the room. Detective Schade began questioning Appellant and confronted him with information provided by his accomplice, Morales. At 2:00 p.m., Appellant asked to speak privately with Reverend McCracken. Questioning restarted at 2:10 p.m., but was interrupted at 2:45 p.m. when Appellant again asked to speak privately with Reverend McCracken. Accordingly, Detective Schade and Investigator Bailey left Appellant alone with Reverend McCracken in the unlocked interview room.

Detective Schade and Investigator Bailey resumed the interrogation of Appellant at 3:05 p.m. During this round of questioning, Appellant stated that he was with his accomplices, Johnson and Morales, in his van with the Banks cousins, but that he did not know that Johnson and Morales were going to kill them, and that he did not shoot them. This interview session ceased at 4:00 p.m. when Appellant agreed to take a

polygraph test. At approximately 4:40 p.m., Appellant was taken from the interview room to the office of Detective Joseph Stajkowski on the same floor.

Detective Stajkowski commenced questioning of Appellant while he was hooked up to the polygraph machine; Detective Schade and Investigator Bailey were not present. At some point during this interrogation, Detective Stajkowski stopped the polygraph interview and informed Appellant that the test indicated that he was acting deceptively in response to questions regarding the murders. Detective Schade and Investigator Bailey returned to Detective Stajkowski's office, where Appellant remained connected to the polygraph machine, and again questioned Appellant about the murders of the Banks cousins. During this interview, Appellant admitted that he, Johnson and Morales had picked up the Banks cousins to "f* * * [them] up" in retaliation for the robbery of Appellant's apartment.

Following this interview, Appellant submitted to a second round of polygraph testing without Detective Schade or Investigator Bailey present. When this round of testing concluded at 6:48 p.m., Detective Stajkowski again informed the officers that Appellant's answers indicated deception. By 7:45 p.m., Appellant left Detective Stajkowski's office and proceeded to give a five-page written statement describing his involvement in the murders. Appellant's written statement commenced at 8:15 p.m. and concluded at 10:15 p.m., following which Appellant was transported to the Berks County prison in connection with the parole violation.

The Commonwealth did not file the criminal complaint charging Appellant with the murders until December 23, 1996. At trial, the entire text of Appellant's written statement was read to the jury.

In denying Appellant's pretrial motion to suppress his written statement, the trial court concluded that Appellant was in custody on the parole violation warrant after he voluntarily surrendered himself at the District Attorney's Office. However, the trial court also concluded that because Appellant was

not arrested on the murder charges until December 23, 1996, Rule 123 of the Pennsylvania Rules of Criminal Procedure[10] and the *Davenport/Duncan* six-hour rule were not implicated in the statements voluntarily given by the Appellant to the police regarding the murders of the Banks cousins.

The threshold question that we must address is whether the *Davenport/Duncan* six-hour rule applies where a defendant is subject to a custodial interrogation that is unrelated to the purpose for which he or she has been detained. As previously noted, this Court created the *Davenport/Duncan* rule to safeguard a defendant's right to a speedy arraignment by requiring suppression of statements given more than six hours after arrest but before arraignment on the charges for which the defendant was arrested.[11] However, we have held that the protections of the *Davenport/Duncan* rule are offense-specific, and that the arrest of a suspect for one criminal offense does not commence the six-hour period for questioning regarding a separate criminal offense. *See Commonwealth v. Washington*, 547 Pa. 563, 692 A.2d 1024 (1997), *cert. denied*, 523 U.S. 1006, 118 S.Ct. 1190, 140 L.Ed.2d 320 (1998) (refusing to suppress defendant's confession to murder on *Davenport/Duncan* grounds where defendant was arrested on an unrelated charge and confessed during an interrogation that occurred more than thirty hours after his arrest on the unrelated charge); *Commonwealth v. Bond*, 539 Pa. 299, 652 A.2d 308 (1995) (although defendant in custody for forty-eight

**10.** Pa.R.Crim.P. Rule 123 provides that "When a defendant has been arrested in a court case, with a warrant, within the judicial district where the warrant of arrest was issued, the defendant shall be afforded a preliminary arraignment by the proper issuing authority without unnecessary delay."

**11.** The rule has many critics who believe that it arbitrarily sets a time limit for arraignment and excludes statements that may, in fact, have been given knowingly, voluntarily and intelligently. *Cf. Commonwealth v. Hughes*, 521 Pa. 423, 555 A.2d 1264, 1284 (1989) (McDermott, J., concurring) (criticizing the "mechanical and discredited six-hour rule"); *Commonwealth v. D'Amato*, 514 Pa. 471, 526 A.2d 300, 307 (1987) (observing "[w]hatever validity the *Davenport* rule retains, its 'six-hour' clock does not begin to run ... until the defendant has been returned to the judicial district wherein the arrest warrant was issued.")

hours prior to giving statement, no violation of *Daven-port/Duncan* because defendant was initially arrested on a separate charge). As we stated in *Bond*, "[t]he fact that appellant was in custody for a different offense at the time he was arrested for the instant matter is not relevant to a determination of whether the six-hour rule was violated when he confessed to the second murder." *Id.* at 312. "Appellant's subsequent arrest . . . for a different crime began a separate event for purposes of the legal requirements of *Duncan.*" *Id.*

We do not believe it wise to extend the protections of *Davenport/Duncan* to custodial interrogations where the defendant has not been placed under arrest for the crime about which he or she is being questioned. The limited function of *Davenport/Duncan* simply does not apply where a defendant has not been placed under arrest and his or her right to a speedy arraignment has not been triggered.[12] That is not to say, however, that a defendant loses all protections against coercion of statements during a custodial interrogation. Those statements must always be the product of a knowing, voluntary and intelligent waiver of one's *Miranda* rights. *See Commonwealth v. Williams*, 539 Pa. 61, 650 A.2d 420 (1994).

Because Appellant was not under arrest for the murders of the Banks cousins when he gave the challenged statement, the statement was not obtained in violation of the *Davenport/Duncan* rule,[13] and since it was given voluntarily, knowingly and

12. In *Commonwealth v. Persiano*, 555 Pa. 428, 725 A.2d 151 (1999), we faced a situation similar to that presented in *Washington, supra,* where a defendant was arrested on one charge and later questioned about a separate crime. We noted that "as in *Washington,* Persiano was detained in police custody for a substantial period of time prior to being questioned regarding [a homicide] but confessed to the murder within three hours from the time such interrogation commenced." *Id.* at 153. We went on to state that "pursuant to *Washington,* the confession occurred within the pertinent six-hour period." *Id.* In both *Washington* and *Persiano,* however, the defendants had not been placed under arrest for murder at the time that they were interrogated regarding those respective murders.

13. Even if the *Davenport/Duncan* rule were applicable, Appellant's written statement would not violate the rule. This Court in *Commonwealth v. Hughes*, 521 Pa. 423, 555 A.2d 1264 (1989) refused to exclude a written memorandum of the defendant's confession, even though

intelligently by Appellant, the trial court was correct in denying his motion to suppress.

### 3. *Denial of Motion for Change of Venue*

Appellant next claims that the trial court erred when it denied his motion for change of venue or venire.

The determination of whether to grant a change of venue rests within the discretion of the trial court and will not be disturbed absent an abuse of that discretion. *Commonwealth v. Counterman*, 553 Pa. 370, 719 A.2d 284, 293 (1998), *cert. denied*, 528 U.S. 836, 120 S.Ct. 97, 145 L.Ed.2d 82 (1999). This is so because it is the trial court that is in the best position to assess the atmosphere of the community and to judge the necessity of any requested change. *Commonwealth v. Karenbauer*, 552 Pa. 420, 715 A.2d 1086, 1092 (1998), *cert. denied*, 526 U.S. 1021, 119 S.Ct. 1258, 143 L.Ed.2d 354 (1999). A change in venue becomes necessary when the trial court concludes that a fair and impartial jury cannot be selected in the county in which the crime occurred. *Id.*

Normally, one who claims that he has been denied a fair trial because of pretrial publicity must show actual prejudice in the empanelling of the jury. *Commonwealth v. Hawkins*, 549 Pa. 352, 701 A.2d 492, 503 (1997). In certain cases, however, pretrial publicity can be so pervasive or inflammatory that the defendant need not prove actual juror prejudice. *Commonwealth v. Carter*, 643 A.2d at 69. Pretrial prejudice is presumed if: (1) the publicity is sensational, inflammatory, and slanted toward conviction rather than factu-

prepared more than six hours after the defendant's arrest, because this amounted to "merely a recital" of the defendant's earlier oral confession, which had been given within six hours of his arrest. *Id.* at 1278. Similarly, the testimony from the pretrial hearings in the present case establishes that Appellant had made most of the incriminating admissions that appear in Appellant's written statement during his answers to questions asked within the first six hours of his custodial interrogation. Thus, even if Appellant were considered to be "under arrest" for the murders of the Banks cousins on December 16, rather than subject merely to a custodial interrogation, his subsequent written statement amounted to not much more than a restatement of his earlier oral admissions. Consequently, pursuant to *Hughes*, suppression on *Davenport/Duncan* grounds would not be warranted.

al and objective; (2) the publicity reveals the defendant's prior criminal record, or if it refers to confessions, admissions or reenactments of the crime by the accused; and (3) the publicity is derived from police and prosecuting officer reports. *Commonwealth v. Pursell*, 508 Pa. 212, 495 A.2d 183, 187 (1985). Appellant claims that he has met this standard because local media coverage of the homicides was so pervasive that by the time jury selection commenced, seventy-five of one hundred twenty-five jury panel members responded affirmatively when questioned concerning knowledge of the case.

 This is correct. Seventy-five members of the jury panel did respond to a question by the court if they had "ever read anything, heard anything, or seen anything on television" about the homicides. N.T. 1/21/98 p. 34. However, "jurors are not required to be totally ignorant of the facts of a case." *Commonwealth v. Counterman*, 719 A.2d at 293. Instead, what is required is a fair and impartial jury. Here, upon further questioning of the panel, it was revealed that only fifteen of those seventy-five had formed *any* opinion, and not a fixed opinion, about Appellant's guilt or innocence based on the pretrial publicity. All of the fifteen who responded yes to this question were excused for cause prior to the start of individual voir dire. *See* N.T. 1/21/98 p. 86. Of the twelve jurors and two alternates ultimately selected for Appellant's trial, all stated that they would be fair and impartial jurors when hearing the case before them.

We have undertaken an independent review of the entire seven hundred-page transcript of the voir dire proceedings and have concluded that pretrial publicity did not result in the inability to select a fair and impartial jury in Berks County. Accordingly, the trial court did not abuse its discretion in denying Appellant's motion for a change of venue or venire, and Appellant is entitled to no relief on this claim.

 As a related issue, Appellant contends that the trial court erred in failing to ask potential jurors question twenty-six of his proposed voir dire questions, which asked "If during the course of this trial you recall anything concerning

any other proceeding involving Mr. Bridges or this matter, will you bring it to the attention of the Court?" This issue requires little comment. The scope of voir dire rests in the sound discretion of the trial judge, whose decision will not be reversed unless palpable error is established. *Commonwealth v. Fisher*, 545 Pa. 233, 681 A.2d 130, 136 (1996). The purpose of voir dire is to ensure the empanelling of a fair and impartial jury capable of following the instructions of the trial court. *Commonwealth v. Marrero*, 546 Pa. 596, 687 A.2d 1102, 1107 (1996), *cert. denied*, 522 U.S. 977, 118 S.Ct. 434, 139 L.Ed.2d 334 (1997). Here, Appellant fails to establish, or even to argue that the denial by the trial court of question twenty-six prejudiced him. Additionally, our review of the record reveals that the trial court properly exercised its discretion in ensuring that a fair and impartial jury tried Appellant, and, accordingly, that there is not due any relief.

### 4. *Additional Jury Issues*

Appellant next objects to the rulings of the trial court in striking for cause a juror he claims was not unalterably opposed to the death penalty; in failing to strike for cause the individual selected to serve as juror number twelve; and in not declaring a mistrial during jury selection when juror number three became ill.

Appellant first claims that the trial court erred in striking for cause panel member number eighty-three, Pamela Kubacki, who Appellant claims was not unalterably opposed to the death penalty.

It is well settled that a court can exclude, for cause, a juror when the juror's views on capital punishment are such as would prevent or substantially impair the performance of his or her duties as a juror in accordance with his or her instructions and his or her oath. *Commonwealth v. Stevens*, 559 Pa. 171, 739 A.2d 507, 521 (1999). Here, the following exchange took place between the court and Ms. Kubacki:

THE COURT: ... And the question is, because of any moral, religious or personal beliefs that you may have, would you be unable to consider imposing the death penalty if it got to that point and you were a member of this jury? A: I think I would find it difficult to personally convict somebody and say that they had to be put to death.

THE COURT: Well, I'm sure it's not a real easy thing. I would not think that it would be an easy thing to do. So it would be a difficult question. The thing that you have to look at and tell us, is would you be unable to do that if the law in Pennsylvania as applied to the facts as you found them in the penalty phase would require it?

A: I probably would find it difficult to do that, yes, and unable to do that.

N.T. 1/22/98 p. 430.

The decision of whether or not to strike for cause is yet another decision that is within the discretion of the trial court and we will not disturb its decision absent an abuse of that discretion. *Commonwealth v. Fisher*, 681 A.2d at 137. The trial court makes the determination based on the prospective juror's answers to questions and demeanor. *Commonwealth v. Stevens*, 739 A.2d at 521. We find based on the above-recited testimony that the trial court did not abuse its discretion when it struck Ms. Kubacki for cause.

Appellant next claims that the court erred in failing to strike for cause juror number twelve, who was a former police commissioner and acknowledged that he had some knowledge of the incident.

The test for determining whether a prospective juror should be disqualified is whether he is willing and able to eliminate the influence of any scruples and render a verdict according to the evidence, and this is to be determined on the basis of answers to questions and demeanor.... It must be determined whether any biases or prejudices can be put aside on proper instruction of the court.... A challenge for cause should be granted when the prospective juror has such a close relationship, familiar, financial, or situational, with the

parties, counsel, victims, or witnesses that the court will presume a likelihood of prejudice or demonstrates a likelihood of prejudice by his or her conduct and answers to questions.... The decision on whether to disqualify is within the discretion of the trial court and will not be reversed in the absence of a palpable abuse of discretion....

*Commonwealth v. Wilson*, 543 Pa. 429, 672 A.2d 293, 299, *cert. denied*, 519 U.S. 951, 117 S.Ct. 364, 136 L.Ed.2d 255 (1996) (quoting *Commonwealth v. Colson*, 507 Pa. 440, 490 A.2d 811, 818 (1985), *cert. denied*, 476 U.S. 1140, 106 S.Ct. 2245, 90 L.Ed.2d 692 (1986)). Presently, Appellant acknowledges that the juror "may have provided the correct answers during his examination ... ", but nevertheless claims error. We note, however, that the juror indicated to the court that he knew no specifics of the incident and that he could reach a fair and impartial decision based on the evidence presented in the courtroom. *See* N.T. 1/27/98 pp. 648, 653. For that reason, the trial court did not err in refusing to strike this juror for cause.

■■■ In his last jury-based claim of error, Appellant claims that the trial court erred when, during jury selection, it did not declare a mistrial after the woman chosen as juror number three became ill and had to be replaced. Appellant claims that the decisions he made during jury selection after selection of juror number three were based on the assumption that juror number three would serve on the jury; that he was left with only four peremptory challenges to select three, rather than two jurors; and that the entire dynamics of jury selection had been altered to his detriment. Appellant relies on *Commonwealth v. Saunders*, 454 Pa.Super. 561, 686 A.2d 25 (1996), to support his argument that he is entitled to a new trial on this issue. We note, however, that *Saunders* does not advance Appellant's position because that case dealt with the question of whether a trial court may substitute an alternate juror *after* the original jury has commenced deliberations. In the instant matter, not only had the jury not commenced deliberations, they had not yet been sworn in as jurors. As stated previous-

ly, the purpose of voir dire is to ensure the empanelling of a fair and impartial jury capable of following the instructions of the trial court. *Commonwealth v. Marrero, supra.* In view of the fact that our review of the record has already revealed that the trial court properly exercised its discretion in ensuring that Appellant was tried by a fair and impartial jury, he is not entitled to relief on this claim of error.

## B. GUILT PHASE ISSUES

### 1. The testimony of George Robles

On appeal, Appellant objects to the admission of testimony by Commonwealth witness George Robles (Robles). Appellant claims that it was error to permit Robles to testify to additional matters not contained in discovery material. Specifically Appellant claims that prior to the offer of proof made on January 29, 1998, immediately preceding Robles' testimony, Robles had told no one that he saw the Appellant pull a black Glock 9 mm. handgun from his waistband on December 8, 1996 and waive it around Robles' house.

We begin, again, with black letter law. The admissibility of evidence is a matter addressed to the sound discretion of the trial court and an appellate court may only reverse upon a showing that the trial court abused its discretion. *Commonwealth v. Ragan,* 538 Pa. 2, 645 A.2d 811, 818 (1994). No abuse of discretion occurred in this matter because, after the offer of proof, Appellant made no objection to the admissibility of this evidence.[14] Moreover, Appellant has established no prejudice arising from the admission of the evidence and we likewise see none. Finally, we note that defense counsel fully cross-examined Robles regarding new allegations by Robles, extensively exploring the issue of recent fabrication on the part of Robles. N.T. 1/29/98 pp. 1064–70, 1079–80, 1085.

14. Defense counsel stated that he had "an objection but I think it will go to cross-examination as opposed to objections of the admissibility of evidence." N.T. 1/29/98 p. 1052. When specifically asked by the trial court, "You're not making any other objections at this point to the offer?" defense counsel answered "No." *Id.* at 1052–53.

■ Appellant also claims that the court erred in permitting Robles' testimony where he was promised or given leniency in exchange for his testimony.

■ Robles, prior to Roderick Johnson's trial, was placed in Berks County Prison in lieu of $200,000.00 material witness bond. After he testified at Roderick Johnson's hearing on April 24, 1997, Robles was released on his own recognizance. Appellant claims that there is no way, other than leniency, to describe the treatment of Robles. What Appellant does not do, however, is to cite any Pennsylvania case law in support of his argument that Robles should not have been permitted to testify.[15] In Pennsylvania, a witness may be cross-examined as to any matter tending to show the interest or bias of that witness so that a jury can properly evaluate the witness' credibility. *Commonwealth v. Nolen*, 535 Pa. 77, 634 A.2d 192, 195–96 (1993). This is precisely what occurred in the instant matter, and the jury was made aware that Robles had been held on a material witness bond and had been released after testifying. N.T. 1/29/98 p. 1072–73. There was, therefore, no error in permitting his testimony.

### 2. *Other testimony*

In his next claim, Appellant alleges error by the trial court not permitting the defense to call three witnesses, C.I. Vega, Ruth Ann Natole, and Mark Baldwin, the district attorney prosecuting Appellant's case.[16]

■ Again, the admission of evidence is within the sound discretion of the trial court and we will not reverse on appeal absent an abuse of that discretion. *Commonwealth v. Puksar*, 559 Pa. 358, 740 A.2d 219, 225 (1999). Appellant first

---

**15.** Appellant does cite a 10 th Circuit case, since overruled, that he claims supports his position.

**16.** Appellant did not raise all of these issues in his Statement of Matters Complained of on Appeal. We will address them however, based on the relaxed waiver standard applicable to capital case direct appeals as elucidated in *Commonwealth v. Zettlemoyer*, 500 Pa. 16, 454 A.2d 937 (1982), *cert. denied*, 461 U.S. 970, 103 S.Ct. 2444, 77 L.Ed.2d 1327, *reh'g denied*, 463 U.S. 1236, 104 S.Ct. 31, 77 L.Ed.2d 1452 (1983).

claims that the trial court erred in prohibiting the testimony of C.I. Vega, of the Reading Police Department, who would have testified that Robles did not tell the police during his initial interviews that Appellant had a Glock 9 mm. pistol in Robles' house on the night of December 8, 1996. However, Officer Angel Cabrera, also of the Reading Police, had just testified that Robles had never told the police that Appellant had a black 9 mm. Glock on December 8, 1998, N.T. 1/30/98 p. 1291, and a trial court may properly exclude evidence that is cumulative of other evidence. *Commonwealth v. Smith,* 694 A.2d at 1091.

Appellant also claims that court reporter Ruth Ann Natole should have been permitted to testify. Ruth Ann Natole was the court reporter in the murder trial of Appellant's co-defendant Roderick Johnson, at which trial Robles also testified. Appellant wished Ms. Natole to read a portion of Robles' testimony given at Johnson's trial. Appellant claims that the purpose of this testimony was to demonstrate the omission of certain facts from Robles' prior testimony, and the inconsistency between the prior testimony and Robles' testimony at Appellant's trial. After reviewing the transcript of Johnson's trial, the trial court sustained an objection to much of the proposed testimony, finding that the questioning of Robles during the Johnson trial was not sufficiently specific to establish impeachment by omission. We find no error here. While it is true that a prior inconsistent statement may be used to impeach a witness, a witness' failure to answer a question not posed at a prior proceeding does not make that testimony inconsistent. *Commonwealth v. Small,* 559 Pa. 423, 741 A.2d 666, 682 (1999).

Finally, Appellant objects to the trial court ruling that prohibited the defense from calling District Attorney Mark Baldwin as a witness.[17] Appellant claimed that District Attorney Baldwin would have testified on January 29, 1998, that the first time witness Robles informed the Commonwealth that

---

17. Rule 3.7,"Lawyer as Witness," of the Rules of Professional Conduct provides that generally a lawyer should not act as an advocate at a trial in which he or she is likely to be a necessary witness.

Appellant had a black 9 mm. Glock handgun on December 8, 1996, was during District Attorney Baldwin's interview with Robles one day before, which would have been January 28, 1998. Appellant claims that District Attorney Baldwin's testimony was critical to establishing prior inconsistent statements on the part of Robles and was a "knowingly false element" of Robles' testimony. The trial court refused to compel District Attorney Baldwin to testify, as much of his testimony would be cumulative. We agree. As stated above, Officer Angel Cabrera had already testified that Robles had not told the police that Appellant had a black 9 mm. Glock on December 8, 1998. N.T. 1/30/98 p. 1291. Further, witness Robles was extensively cross-examined by defense counsel regarding his statements to police and admitted that he did not immediately tell the police about a 9 mm. gun in Appellant's possession. N.T. 1/29/98 p. 1065. Since the evidence offered would have been cumulative of previously offered evidence, we find that the trial court did not abuse its discretion when it refused to allow the prosecuting attorney to be called to the stand by defense counsel.

### 3. *Prosecutorial Statements*

In this claim of error, Appellant argues that the trial court erred in not declaring a mistrial during the prosecutor's guilt phase closing argument. Appellant claims that the district attorney committed prosecutorial misconduct when he implied that the Appellant was the actual shooter of Damon and Gregory Banks and Appellant had actually only been charged as an accomplice in their murders. See: N.T. 2/3/98 p. 1389.

In reviewing the prosecutor's comments, we note that a prosecutor must be free to present his or her arguments with logical force and vigor. *Commonwealth v. Miles,* 545 Pa. 500, 681 A.2d 1295, 1300 (1996), *cert. denied,* 520 U.S. 1187, 117 S.Ct. 1472, 137 L.Ed.2d 684 (1997). Comments by a prosecutor do not constitute reversible error "unless the unavoidable effect of such comments would be to prejudice the jury, forming in their minds a fixed bias and hostility toward

34

the defendant such that they could not weigh the evidence objectively and render a true verdict." *Commonwealth v. Copenhefer*, 553 Pa. 285, 719 A.2d 242, 257 (1998). In this case, we do not believe that the comments complained of had such an "unavoidable effect." We note that after defense counsel objected to this line of argument, the trial court sustained the objection and gave the following cautionary instruction: "Ladies and gentlemen, I have sustained the objection of defense counsel. The District Attorney's Information charges this defendant as an accomplice of Roderick Johnson in the murder and aggravated assault offenses. Not as the actor and killer himself. To any argument otherwise, is improper and I sustain the objection." N.T. 2/3/98 p. 1391. Because the trial court averted any possible prejudice by giving this immediate cautionary instruction, Appellant's claim fails.

### 4. *Jury Instructions and Exhibits*

In his next claims of error, Appellant challenges the accomplice jury charge and conspiracy jury charge of the trial court. First, Appellant claims that the trial court insufficiently instructed the jury regarding accomplice liability for first-degree murder.

It is axiomatic that a jury charge is to be read as a whole and that the trial court has broad discretion in phrasing its instructions so long as the law is clearly, adequately and accurately presented to the jury. *Commonwealth v. Miller*, 560 Pa. 500, 746 A.2d 592, 603 (2000). This Court will not review a charge by taking isolated comments out of context. *Id.* To be found guilty of first-degree murder, a jury must find that the accomplice himself, and not just the actual slayer, had the specific intent to kill. *Commonwealth v. Huffman*, 536 Pa. 196, 638 A.2d 961 (1994). When we review the trial court's charge to the jury, we find that the court did specifically inform the jury that in order to find Appellant guilty of first-degree murder "the Commonwealth must also prove that he [Appellant] had a specific intent to kill, even though Roderick Johnson was the actual slayer." N.T. 2/3/98 p. 1402. (*See*

*also* p. 1423 where the court reiterated that to find the Appellant guilty "one of the elements of the crime of murder of the first degree is specific intent to kill.") When the jury later asked the court to clarify the differences between first and third degree murder, the trial court again instructed the jury that in order to find Appellant guilty of first-degree murder they must find that the Appellant himself had the specific intent to kill Damon and Gregory Banks. N.T. 2/3/98 p. 1472. Given that the record reveals that the trial court fully informed the jury as to the mental state required to find Appellant guilty of first-degree murder as an accomplice, no relief is due. *See also: Commonwealth v. Spotz*, 552 Pa. 499, 716 A.2d 580 (1998), *cert. denied*, 526 U.S. 1070, 119 S.Ct. 1466, 143 L.Ed.2d 551 (1999) (jury charge adequately informed jury that in order to find defendant guilty of first-degree murder on an accomplice liability theory, the jury was required to find that defendant himself harbored the specific intent to kill.)

 Appellant also challenges the trial court's instructions regarding conspiracy. At the end of its charge to the jury regarding the crimes of conspiracy to commit murder and conspiracy to commit aggravated assault, the trial court instructed them that they could find the Appellant guilty of "murder and aggravated assaults as a conspirator if you are satisfied beyond doubt, first, that the defendant agreed with Roderick Andre Johnson and/or Richard Morales that they or one of them would commit the crime...." N.T. 2/3/98 p. 1412–13. Appellant claims that this was error and that the jury was inadequately charged that it could not find the Appellant guilty of the substantive crimes simply because he engaged in conduct that met the elements of the crime of conspiracy to the substantive crime. However, after defense counsel informed the court that it may have misspoken when giving the conspiracy charge, the trial court reinstructed the jury of the elements it needed to find the Appellant guilty of conspiracy to commit murder and conspiracy to commit aggravated assault. N.T. 2/3/98 p. 1434–35. Looking at the charge as a whole, as we must, *Miller*, 746 A.2d at 603, and recogniz-

ing that the trial court later reinstructed the jury on the elements that must be proven to find the Appellant guilty of the substantive crime of first-degree murder, N.T. 2/3/98 pp. 1471–72, we do not find that the trial court committed reversible error in its charge to the jury.

■ Next, Appellant claims that the trial court erred when it denied his motion that Exhibit C–106 be sent out with the jury during its deliberation. Exhibit C–106 was a letter written by Commonwealth witness George Robles while he was in jail on material witness bail. The letter was sent to police investigator Angel Cabrera, and in it Robles wrote that he would "do anything" to get out of jail. Appellant argues that this letter cast a dark shadow on Robles' credibility, was crucial to his defense, and should have been sent out with the jury.

■ Pa.R.Crim.P Rule 1114(A) provides that: "Upon retiring, the jury may take with it such exhibits as the trial judge deems proper...." The judge's decision on what exhibits to send out with the jury is committed to his or her discretion, and will not be reversed absent an abuse of that discretion. *Commonwealth v. Rucci*, 543 Pa. 261, 670 A.2d 1129, 1141 (1996), *cert. denied*, 520 U.S. 1121, 117 S.Ct. 1257, 137 L.Ed.2d 337 (1997). In the instant matter, the trial judge refused to send out this exhibit since, as the sole piece of evidence sent out with the jury, it would have been unnecessarily highlighted. Further, the jury was well aware of the letter. Robles had been cross-examined about the contents of this letter and defense counsel read the letter in its entirety to the jury during his closing argument. Accordingly, we find that the trial court properly exercised its discretion in refusing to send Exhibit C–106 into the jury room.

## C. PENALTY PHASE ISSUES

### 1. *Constitutionality of Pennsylvania's Death Penalty Statute*

Appellant next claims that the trial court erred in not declaring that the Pennsylvania death penalty statute violates

the Federal and the State Constitutions. First, Appellant claims that the trial court erred in failing to declare the Pennsylvania death penalty statute unconstitutional because it mandates a penalty of death where there is at least one aggravating circumstance and no mitigating circumstance. He acknowledges that this Court has already decided this issue, but argues that the law should be changed, as the existing law is unjust. In *Commonwealth v. Tilley*, 528 Pa. 125, 595 A.2d 575 (1991), this Court reiterated that Appellant's argument had already been specifically rejected by the United States Supreme Court in *Blystone v. Pennsylvania*, 494 U.S. 299, 110 S.Ct. 1078, 108 L.Ed.2d 255 (1990), and by this Court in previous death penalty cases including *Commonwealth v. Peterkin*, 511 Pa. 299, 513 A.2d 373 (1986), *cert. denied*, 479 U.S. 1070, 107 S.Ct. 962, 93 L.Ed.2d 1010 (1987). We are presented with no persuasive argument that these cases were incorrectly decided, and accordingly, no relief is due on this claim.

Appellant also argues that the death penalty statute is unconstitutional because the decision to seek the death penalty is within the discretion of the county district attorney and a defendant is not given the right to participate in this decision. We first note that Appellant offers no case law or persuasive argument in support of his unusual claim that a defendant should have the right to participate in this decision. Further, during the penalty phase, a defendant may present evidence in support of any of the mitigating factors outlined in the statute. 42 Pa.C.S.A. § 9711(a)(2). Finally, the Pennsylvania death penalty statute has survived numerous constitutional challenges, *see Commonwealth v. DeHart*, 512 Pa. 235, 516 A.2d 656 (1986), *cert. denied*, 483 U.S. 1010, 107 S.Ct. 3241, 97 L.Ed.2d 746 (1987), and in *Commonwealth v. Zettlemoyer*, *supra.*, this Court held that the current death penalty statute was acceptable under both the federal and the state Constitutions.

## 2. *Aggravating Circumstances*

In this claim of error, Appellant alleges that the trial court should not have permitted any aggravating circum-

stances to be submitted to the jury. Section 9711(d)(11) establishes as an aggravating factor that the "defendant has been convicted of another murder committed in any jurisdiction and committed either before or at the time of the offense at issue." 42 Pa.C.S.A. § 9711(d)(11). Appellant first claims that 42 Pa.C.S.A. § 9711(d)(11) should have been stricken by the trial court since he was charged only as an accomplice to the murders, and not as a principal. He argues that since the term "accomplice" was included in three other subsections (42 Pa.C.S.A. § 9711(d)(13), (14), (15)), but not in (d)(11), this indicates that the legislature did not intend for an accomplice to be subject to the same penalty as a principal in a(d)(11) situation.

We disagree. The law is that a person is held legally responsible for the conduct of another person when he is an accomplice of such other person in the commission of the offense. 18 Pa.C.S.A. § 306(b)(c). Appellant was convicted of the murders of Damon Banks and Gregory Banks, committed at the same time, "the time of the offense at issue." Subsection (d)(11) therefore was submitted correctly to the jury. Moreover, we affirmed a sentence of death in *Commonwealth v. Speight,* 544 Pa. 451, 677 A.2d 317, 326 (1996), *cert. denied,* 519 U.S. 1119, 117 S.Ct. 967, 136 L.Ed.2d 852 (1997), (albeit on a slightly different issue) where the defendant was convicted of two murders committed at the same time and we reiterated that a death sentence is not disproportional merely because the alleged actual shooter was sentenced to life imprisonment and not death.

In his next claim, Appellant argues that the trial court erred in denying his motion to strike as an aggravating circumstance 42 Pa.C.S.A. § 9711(d)(14), and to bar evidence in support of this circumstance.

Section 9711(d)(14) provides that it shall be an aggravating circumstance if:

At the time of the killing, the victim was or had been involved, associated or in competition with the defendant in the sale, manufacture, distribution or delivery of any con-

trolled substance...and the killing resulted from or was related to that association, involvement or competition to promote the defendant's activities in selling, manufacturing, distributing or delivering controlled substances or counterfeit controlled substances.

42 Pa.C.S.A. § 9711(d)(14). Appellant argues that the evidence in support of this factor, offered through Commonwealth witness George Robles, should not have been admitted and mandates that he be granted a new sentencing hearing.

To reiterate, aggravating circumstances (d)(11) and (d)(14) were submitted to the jury. The jury found, beyond a reasonable doubt, circumstance (d)(11) and did not find that the Commonwealth had proved factor (d)(14) beyond a reasonable doubt. Because the jury found no mitigating factors, it set Appellant's sentence at death. We first find that the trial court did not err in submitting testimony of circumstance (d)(14) to the jury. The fact that the jury did not find this factor does not mean that the evidence was inadmissible. A death sentence will be reversed only if the jury relied on an unsupported and improper aggravating circumstance in rendering its verdict. *Commonwealth v. Williams*, 537 Pa. 1, 640 A.2d 1251, 1262 (1994). "However, reversal of a defendant's sentence is not warranted by submitting an aggravating circumstance to the jury if the jury does not find beyond a reasonable doubt the existence of that improper aggravating circumstance in rendering its verdict of death since such error is harmless." *Commonwealth v. Jones*, 542 Pa. 464, 668 A.2d 491, 519 (1995), *cert. denied*, 519 U.S. 826, 117 S.Ct. 89, 136 L.Ed.2d 45 (1996). Hence, Appellant is entitled to no relief on this claim.

### 3. *Allegations of Prosecutorial Misconduct in the Penalty Phase*

In this claim of error, Appellant objects to elements of the prosecutor's redirect examination of George Robles and to several statements made by the prosecutor in his closing argument during the penalty phase. First, Appellant objects to a line of questioning of George Robles where the prosecutor

attempted to obtain Robles' opinions regarding the concepts of "respect on the street" and "retaliation" in the drug world. He claims that the only purpose in pursuing this line of questioning was to paint him as a violent individual who would routinely engage in acts of retaliation against individuals for drug related reasons. However, the trial court sustained Appellant's objections to this line of questioning, and we fail to see how the unanswered hypothetical questions prejudiced Appellant so that he would be entitled to relief.

■ The remainder of Appellant's claims concerns the prosecutor's closing argument. Appellant argues that the underlined language constitutes prosecutorial misconduct, that a mistrial should have been granted, and that he is entitled to a new penalty hearing.

This is perhaps one of my least pleasant duties but it is one which I must fulfill. It is one which the law requires *and it is one which I strongly believe in.* N.T. 2/4/98 P. 1625.

They went there to rip off his drugs and cash, plain and simple. The drugs, crack cocaine. You probably heard in this case from Mr. Robles, *things about a community that we only see in television.* People distributing drugs on the street corner. What did Mr. Robles tell you when he was asked who do they sell drugs to? *People you could walk out of the courthouse seeing walking by. Crack cocaine, rock cocaine as he called it. A kilo of cocaine. Id.* at 1627.

In this case, by your verdict yesterday, you found the defendant was either the killer or an accomplice to the killing, either/or he is equally responsible for the actions and death. *Id.* at 1628.

And you heard Mr. Maynard ask Mr. Robles what was his reputation in the community? Shawn Bridges was a big time mover. He moved weight. *And not to retaliate would affect his reputation. Id.* at 1630–31.

He is dealing with it, and he moved ahead and a heart murmur does not give someone an excuse to sell crack cocaine *to peddle poison on our streets* and to kill men in

retaliation for trying to steal his drugs and his cash.[18] *Id.* at 1632.

We consider these comments in the context of the entire summation, and reiterate that a prosecutor's comments will not warrant a mistrial unless they aroused emotions of the jury to such an extent that it was impossible for the jury to impose a sentence based on relevant evidence. *Commonwealth v. Johnson*, 542 Pa. 384, 668 A.2d 97, 107–08 (1995), *cert. denied*, 519 U.S. 827, 117 S.Ct. 90, 136 L.Ed.2d 46 (1996). Also, during the penalty phase a prosecutor must be accorded reasonable latitude in arguing his or her position to the jury and may employ oratorical flair in arguing in favor of the death penalty. *Commonwealth v. Cox*, 546 Pa. 515, 686 A.2d 1279, 1288 (1996), *cert. denied*, 522 U.S. 999, 118 S.Ct. 567, 139 L.Ed.2d 407 (1997). A prosecutor has more latitude in presenting argument at the penalty phase since the presumption of innocence no longer applies. *Commonwealth v. Rompilla*, 554 Pa. 378, 721 A.2d 786, 790 (1998). Viewing the challenged comments in this context, we find no comment so egregious that it would prejudice the jury to such an extent that they could not weigh the evidence objectively. Furthermore, even taking the comments cumulatively would not entitle Appellant to relief. Additionally, the trial court offered the following cautionary instruction that corrected any possible prejudice to Appellant.[19]

Ladies and gentlemen, there are three matters I want to address with you before we hear the speech from the defense. In the closing argument of the Commonwealth, the District Attorney gave you his personal opinion about the death penalty, that is not permissible argument to you. Personal opinions of either counsel or the Court have nothing to do with your decision and you should not consider

18. We note for the record that defense counsel at no time objected to this statement by the prosecutor, and it has, apparently, been raised for the first time in Appellant's brief to this Court. Since this is a capital case, we nonetheless have considered it. *See Zettlemoyer, supra.*

19. The trial court gave its cautionary instruction after the prosecutor's closing because defense counsel made no objection until the prosecutor had finished speaking.

that in any fashion whatsoever. Your job will be to receive the arguments of counsel. The law as I instruct you and then to decide without regard to personal opinions of any of the participants.

Additionally, there was a reference to the fact that by your verdict you found the defendant to have either been the killer or an accomplice of the killer of the two Banks cousins. As you recall from my instructions yesterday, Mr. Bridges was charged as an accomplice and he was found guilty as an accomplice. So with that correction, keep that in mind when you are evaluating the aggravating, possible aggravating circumstances.

And finally, there were some assertions by the District Attorney concerning the Banks brothers or cousins being involved in competition in the drug business. You must remember that these were assertions by the District Attorney in argument. They were inferences that he is arguing to you, you can legitimately draw from facts in evidence. However, there are no direct facts of drug competition with the defendant. Keep that in mind when evaluating the testimony and arguments. All right. With that in mind, we'll call upon the defense.

N.T. 2/4/98 pp. 1640–41. Appellant is entitled to no relief on this claim.

### 4. *Jury Instructions*

■ In another claim of trial court error, Appellant argues that the court erred in denying his request for a jury instruction that, in Pennsylvania, a sentence of life imprisonment does not permit parole. This instruction is commonly known as a "*Simmons* instruction," *Simmons v. South Carolina,* 512 U.S. 154, 114 S.Ct. 2187, 129 L.Ed.2d 133 (1994).

This issue has been before this Court numerous times. The law of this Commonwealth is that a *Simmons* instruction is required to be given only in those cases where the future dangerousness of the defendant is placed at issue.[20] *Common-*

---

**20.** A minority of this Court is of the view that a *Simmons* instruction should be given, prospectively, in all capital cases. *See Commonwealth*

*wealth v. Chester*, 557 Pa. 358, 733 A.2d 1242, 1257 (1999). Since the prosecutor did not argue Appellant's future dangerousness to the jury, Appellant was not entitled to the requested charge, and this claim must necessarily fail.[21]

### 5. *Penalty Phase Deliberations*

The last two claims of Appellant involve the jury's deliberations during the penalty phase of his trial. Appellant first claims that the court abused its discretion and/or coerced the jury into reaching its decision after it indicated that it could not reach a unanimous verdict.

 The jury retired to deliberate Appellant's sentence at 4:20 p.m. on February 4, 1998. At approximately 8:15 that same evening, the jury foreman informed the court that the jury could not reach a verdict, that it was "split", and that he did not feel that further instructions would assist the jury in reaching a verdict. N.T. 2/4/98 p. 1667. Defense counsel at that point requested that the court declare a hung jury. Instead, the trial court ended the deliberations for the day and instructed the jury to return in the morning to continue deliberations.

 It is well-settled law that the amount of time that a jury is kept together to deliberate is another matter that is within the discretion of the trial judge, whose decision will only be reversed for an abuse of discretion or evidence that the verdict was the product of coercion of an overworked or fatigued jury. *Commonwealth v. Chester*, 526 Pa. 578, 587 A.2d 1367(Pa.), *cert. denied*, 502 U.S. 959, 112 S.Ct. 422, 116 L.Ed.2d 442 (1991); *Commonwealth v. Johnson*, 542 Pa. 384, 668 A.2d 97 (1995). In *Johnson*, this Court listed some factors to consider when determining whether the trial court abused its discretion: "the charges at issue, the complexity of the

*v. Clark*, 551 Pa. 258, 710 A.2d 31 (1998), *cert. denied*, 526 U.S. 1070, 119 S.Ct. 1465, 143 L.Ed.2d 550 (1999).

21. In fact, Appellant's counsel did specifically argue to the jury that "In Pennsylvania, just so there is no misunderstanding among any of you, there is no parole from a life sentence in Pennsylvania." N.T. 2/4/98 p. 1642.

issues, the amount of testimony to consider, the length of trial, the solemnity of the proceedings and indications from the jury on the possibility of reaching a verdict." *Id.* at 108.

In the instant matter, testimony began on January 27, 1998 and continued until February 3, 1998, when the jury retired to deliberate Appellant's guilt. Penalty phase evidence was presented on February 4, 1998, with the jury beginning deliberation on whether to impose the death penalty or life in prison at 4:20 p.m. that same day. Less than four hours later, the jury informed the court that it could not reach a decision. The trial court determined that "the jury was not hopelessly deadlocked. They had received many days of testimony and the hour was late. Clearly, to the eyes of this Court, some of the jurors were willing to continue deliberations...." Trial court opinion at p. 29.

We find no abuse of discretion in the action of the trial court. The matter being considered was of the utmost gravity. The trial had been long. The hour was late. The jury had deliberated for only four hours. *See Commonwealth v. Wharton*, 542 Pa. 83, 665 A.2d 458 (1995), *cert. denied*, 517 U.S. 1247, 116 S.Ct. 2504, 135 L.Ed.2d 195 (1996) (where jury had only deliberated five hours and thirty-two minutes, no abuse of discretion in requiring jury to deliberate further). As in *Johnson*, the jury here did not indicate that it was hopelessly deadlocked. The trial court did not err in ordering the jury to resume deliberations.

 Appellant's final claim in this appeal is that the trial court erred in denying his motion to authorize an investigation into the possibility that "extraneous evidence" was introduced into the jury's deliberation process.

As stated above, the jury was sent home on the evening of February 4, 1998, after four hours of deliberation. The jury returned to resume its deliberations at 9:30 a.m. the next morning, February 5, 1998. That morning, after the trial judge instructed them to resume deliberations, he asked if they had anything to ask him. The jury foreman responded: "I think we have some questions that we'll talk about when we

get upstairs." N.T. 2/5/98 p. 1672. Appellant claims that based on this statement, it is a reasonable inference that some extraneous matters had entered jury deliberations prior to the jury returning to the courtroom. The position of the Appellant is that because the jury was sent home for the night, this provided all jurors the opportunity to obtain information, discuss the case with others, and access the Internet for research. At trial on the morning of February 5, 1998, defense counsel asked the court to inquire of the jury whether any of them had discussed the matter or conducted research. The court did so, with no response from the jury. N.T. 2/5/98 p. 1691. Nevertheless, after the jury returned with a verdict, Appellant filed a motion to authorize an investigation into the possibility that extraneous evidence had entered jury deliberation. In this motion, Appellant requested that the court authorize $1,000.00 to fund this investigation.

The trial court held a hearing on Appellant's motion on April 28, 1998, at which time Appellant presented absolutely no evidence in support of his theory.[22] After the hearing the court denied the motion, which Appellant now contends was erroneous, thus entitling him to a new penalty phase hearing.

 The law is clear in this Commonwealth that jurors cannot impeach their own verdict by testifying as to what occurred during deliberations. *Commonwealth v. Sero,* 478 Pa. 440, 387 A.2d 63 (1978). There is, however, an exception to this rule that permits post-trial testimony regarding extraneous influences that might have prejudiced the jury during deliberations. *Boring v. LaMarca,* 435 Pa.Super. 487, 646 A.2d 1199, 1201, *alloc. denied,* 539 Pa. 673, 652 A.2d 1319 (1994). While such testimony may be permissible, we agree with the trial court that the failure of Appellant to produce even a scintilla of evidence to support what is merely speculation on his part is fatal to his claim. Furthermore, a jury is presumed to have followed the instructions of the trial court, *Commonwealth v. Gease,* 548 Pa. 165, 696 A.2d 130(Pa.), *cert. denied,* 522 U.S. 935, 118 S.Ct. 343, 139 L.Ed.2d 266 (1997),

---

22. Appellant did call as a witness the court reporter who did not testify to anything that would advance the Appellant's argument.

and here the trial court specifically instructed the jury, before sending them home on the night of February 4, 1998, that it was of the utmost importance that they not allow anyone to talk to them about their deliberations. N.T. 2/4/98 p. 1669. Therefore, we find that the trial court did not err when it declined to authorize an investigation into Appellant's unsupported speculation.

## III. CONCLUSION

We find no error entitling Appellant to relief. There was sufficient evidence to support the jury's determination of Appellant's guilt and sufficient evidence to support the aggravating circumstance found by the jury in imposing the death penalty. For the foregoing reasons, we affirm the verdicts and the sentences of death imposed upon Shawnfatee M. Bridges by the Court of Common Pleas of Berks County. The Prothonotary of the Supreme Court of Pennsylvania is directed to transmit, within ninety days, the complete record of this case to the Governor of Pennsylvania. 42 Pa.C.S.A. § 9711(i).

Justice SAYLOR files a Concurring Opinion, in which Justice CAPPY joins.

SAYLOR, Justice, concurring.

I join the majority's disposition and reasoning with respect to all issues, except as to the question concerning the application of the *Davenport/Duncan* six-hour rule to Appellant's written confession. With respect to such issue, I join only the majority's disposition, as I agree with its conclusion, in footnote 13, that this Court's decision in *Commonwealth v. Hughes*, 521 Pa. 423, 451, 555 A.2d 1264, 1278 (1989), is controlling. In text, however, the majority also holds that the six-hour rule does not apply to a custodial interrogation where the defendant has not been formally placed under arrest for the crime about which he or she is being questioned. I disagree that application of a judicially-imposed, bright-line rule set out to advance the salutary purposes of assuring prompt arraignment and controlling the effects of custodial

interrogation should depend entirely upon the context, or potentially pretext, initially employed by law enforcement officers to bring the defendant into the interrogation setting. In my view, as the rule is formulated, the policies underlying it can be consistently effectuated only if the subject matter of the custodial interrogation is made the controlling consideration, as was suggested in *Commonwealth v. Persiano*, 555 Pa. 428, 432, 725 A.2d 151, 153 (1999).

Given the present holding, I now favor abandonment of the *Davenport/Duncan* construct and reversion to the federal model entailing consideration of the totality of the circumstances in every case. *See, e.g., Arizona v. Fulminante*, 499 U.S. 279, 285–86, 111 S.Ct. 1246, 1252, 113 L.Ed.2d 302 (1991). I find the federal model vastly superior to continuation of a rule so readily capable of avoidance as to function as no rule at all; indeed, I believe that its maintenance on such terms carries with it the potential for diminishing respect for the courts' authority in the eyes of those subject to their lawful mandates.

Justice CAPPY joins this concurring opinion.